## CONTINENTAL ILLINOIS NATIONAL BANK & TRUST CO. *v.* CHICAGO, ROCK ISLAND & PACIFIC RY. CO.*

Nos. 479 and 480.   Argued February 12, 13, 1935.—Decided April 1, 1935.

\* Together with Nos. 481 and 482, *Chase National Bank* v. *Chicago, R. I. & P. Ry. Co.;* Nos. 483 and 484, *Mississippi Valley Trust Co.* v. *Chicago, R. I. & P. Ry. Co.;* Nos. 485 and 486, *Harris Trust & Savings Bank* v. *Chicago, R. I. & P. Ry. Co.;* Nos. 487 and 488, *New York Trust Co.* v. *Chicago, R. I. & P. Ry. Co.;* and Nos. 489 and 490, *Reconstruction Finance Corp.* v. *Chicago, R. I. & P. Ry. Co.,* all on certiorari to the Circuit Court of Appeals for the Seventh Circuit.

650

*Mr. Herbert A. Friedlich,* of counsel for Continental Illinois National Bank & Trust Co., and *Mr. Paul D. Miller,* of counsel for the Chase National Bank, argued the cause for all five of the banks and trust companies. These petitioners all united in one brief, from which the following summary of points is taken. The appearances on the brief were: *Messrs. Isaac H. Mayer, Carl Meyer, David F. Rosenthal,* and *Herbert A. Friedlich* for the Continental Illinois National Bank & Trust Co.; *Messrs. Henry Root Stern* and *Paul D. Miller* for the Chase National Bank; *Messrs. T. M. Pierce* and *S. Mayner Wallace* for the Mississippi Valley Trust Co.; *Mr. Hal C. Bangs* for Harris Trust & Savings Bank; and *Messrs. Edwin W. Sims, Franklin J. Stransky,* and *James P. Carey, Jr.,* for the New York Trust Co.

*Messrs. A. A. Berle, Jr.,* and *Cassius M. Clay,* with whom *Solicitor General Biggs* and *Mr. Stanley Reed* were on the brief, for the Reconstruction Finance Corp., petitioner in Nos. 489 and 490.

654

*Mr. Elihu Root, Jr.,* with whom *Messrs. George W. Wickersham, Edward C. Bailly, Wilkie Bushby, Joseph Schreiber, W. Lloyd Kitchel,* and *Eugene J. Conroy* were on the brief, for the Bondholders Protective Committees, respondents.

*Mr. Edward W. Bourne,* with whom *Messrs. James H. McIntosh* and *Clifton P. Williamson* were on the brief, for the Protective Committee for the Chicago, R. I. & P. Ry. Co. General Mortgage Bonds, respondent.

*Mr. Marcus L. Bell,* with whom *Messrs. W. F. Dickinson* and *W. F. Peter* were on the brief, for the Trustees in Bankruptcy, respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

On June 7, 1933, The Chicago, Rock Island & Pacific Railway Co. filed a petition seeking a reorganization under

§ 77 of the Bankruptcy Act, in the federal District Court for the Northern District of Illinois, Eastern Division, alleging that it was "unable to meet its debts as they mature." Nine of the debtor's subsidiaries thereafter joined in the proceedings as permitted by subdivision (a) of the section. On September 26, 1933, the debtor filed a petition for instructions which alleged that it had outstanding collateral notes secured by mortgage bonds, part of which were issued by it, part by corporations forming a part of the system; that it had been unable to pay interest on its funded debt secured by mortgage liens on various portions of its property; that it would be obliged to default on interest about to become due on other mortgage bonds of the system; that the value of the collateral securing each of the outstanding notes is substantially in excess of the loan thereby secured; that if holders of the notes should sell the collateral it would cause a substantial and irreparable loss to the trust estate; and that a forced sale of the collateral at the present time might result in a substantial deficiency judgment against the debtor and the depletion of the respective interests in the trust estate of all creditors in proportion to the rank and lien of the obligations by which their claims or interests therein are evidenced. The petition prayed that the court determine whether it should enjoin the holders of the collateral notes, in the event of a default, from selling any of the collateral.

Practically all of the collateral held by the banks and the Reconstruction Finance Corporation consists of bonds of the debtor and its subsidiaries. These bonds are secured by mortgages on the property of the system; and the collateral, therefore, constitutes fractional interests in the liens created thereby. The collateral pledged to the banks consists of bonds of the Rock Island or of bonds (guaranteed by the debtor) of one of the subsidiary corporations, wholly owned and operated under lease by the

debtor. Six of the collateral notes, aggregating $13,659,877.58, are held by the Reconstruction Finance Corporation and are secured by collateral of the face value of $41,702,465.85.[1] The remaining notes, aggregating $4,125,000 in amount, and secured by collateral of the face

---

[1] The collateral pledged with the notes held by the Reconstruction Finance Corporation consists of the following securities:

Listed Collateral:

| | |
|---|---|
| The Chicago, Rock Island and Pacific Railway Company First and Refunding 4% Gold Bonds | $7,575,000.00 |
| St. Paul and Kansas City Short Line Railroad Company First Mortgage 4½% Gold Bonds | 9,374,500.00 |
| Rock Island, Arkansas and Louisiana Railroad Company First Mortgage 4½% Gold Bonds | 3,862,000.00 |
| Total | $20,811,500.00 |

Unlisted Collateral:

| | |
|---|---|
| The Chicago, Rock Island and Gulf Railway Company Extension First Mortgage 5% Bonds | $6,927,000.00 |
| The Chicago, Rock Island and Gulf Railway Company Carrollton Branch 6% Bonds | 331,000.00 |
| Kankakee & Senaca Railroad Company 4½% Bonds | 352,000.00 |
| Rock Island and Dardanelle Railway Company First Mortgage 5% Bonds | 100,000.00 |
| Rock Island Memphis Terminal Depot First Mortgage 5% Bonds | 900,000.00 |
| Rock Island Memphis Terminal First Mortgage 5% Bonds | 400,000.00 |
| Rock Island Omaha Terminal First Mortgage 5% Bonds | 906,000.00 |
| Rock Island Improvement Company: | |
| Blue Island Shops Bonds | 199,000.00 |
| Cedar Rapids Terminal Bonds | 369,732.99 |
| Little Rock Mortgage Bonds | 278,492.49 |
| Peoria Terminal Mortgage Bonds | 290,247.86 |
| First and Collateral 5% Bonds | 3,310,000.00 |

value of $14,409,000,[2] are held severally by five banks—
The Chase National Bank and the New York Trust Company, of New York City, the Continental Illinois National Bank and Trust Company and Harris Trust and

| | |
|---|---:|
| Trinity & Brazos Valley Receiver's Certificates. | $747,492.51 |
| Trinity & Brazos Valley First Mortgage Bonds (now pledged under Colorado & Southern Mortgage; C. R. I. & P. has agreed to pledge them with Reconstruction Finance Corporation upon release from that Mortgage May 1, 1935)........................ | 4,380,000.00 |
| Total ................................ | $19,490,965.85 |
| Assignment of Chicago, Rock Island and Pacific Railway Company's distributive share in assets of Railroad Credit Corporation, approximately................................... | 1,400,000.00 |

[2] The notes held by the five banks and the collateral securing the same are as follows:

| | | Collateral | |
|---|---:|---:|---:|
| | Amount of loan | C. R. I. & P. Refunding 4% bonds | St. Paul & Kansas City Short Line 4½% Gold Bonds |
| Chase National Bank | $2,000,000 | $3,253,000 | $3,956,000 |
| Continental Illinois Bank and Trust Co | 1,250,000 | 1,307,000 | 2,758,000 |
| New York Trust Co | 500,000 | 800,000 | 1,010,000 |
| Harris Trust & Savings Bank | 250,000 | 405,000 | 490,000 |
| Mississippi Valley Trust Company | 125,000 | 190,000 | 240,000 |
| | 4,125,000 | 5,955,000 | 8,454,000 |

The $4,125,000 was reduced to $3,866,923.34 by application of Debtors' deposits in the Continental and Mississippi Valley banks.

The St. Paul and Kansas City Short Line 4½% Gold Bonds are mortgage bonds of a corporation whose capital stock is owned by the Debtor; and they are guaranteed principal and interest by it.

Savings Bank, of Chicago, and Mississippi Valley Trust Company, of St. Louis. Each of the collateral notes contains a provision that it shall become due in case of, among other events, (1) non-payment of interest, (2) insolvency of the debtor, (3) appointment of a receiver for the debtor. Each note held by a bank provides also that it shall become due in case of non-payment of interest on any of the notes held by the Reconstruction Finance Corporation. And all the outstanding notes provide that:

" Upon default of any kind hereunder, the payee may sell in . . . New York City, or elsewhere . . . all or any of the security held for the payment of this note, at any broker's board or at public or private sale, without . . . notice . . . And the payee may be the purchaser of any or all property, rights and/or interests so sold. . . ."

None of the noteholders was a party to the proceeding. No noteholder was ever served with process; and only the two Chicago banks were residents of the district. But notice of the intention to present the petition for instructions had been sent by registered mail to each of the noteholders, and also to the five protective committees representing security holders of the system.[3] All of these parties were represented at the hearing. The holders of the collateral notes appeared specially, and objected to the jurisdiction of the court on the ground that (1) it had no jurisdiction of the person; (2) no jurisdiction over, or possession of, the property, the sale of which was about to

---

[3] Protective Committee for The Chicago, Rock Island & Pacific Railway General Mortgage 4% Bonds; Protective Committee for The Chicago, Rock Island & Pacific Railway First and Refunding 4% Gold Bonds and Secured 4½% Gold Bonds Series A; Protective Committee for the St. Paul & Kansas City Short Line 4½% Gold Bonds and Rock Island, Arkansas and Louisiana 4½% Gold Bonds; Protective Committee of the Burlington, Cedar Rapids and Northern Consolidated 5% Gold Bonds; Protective Committee for the Chicago, Rock Island & Pacific Railway, 30-year 4½% Convertible Bonds.

be restrained; and (3) no jurisdiction to grant in a summary proceeding the injunction suggested; but it was stipulated that the noteholders might present argument and file briefs on the merits without waiving their special appearances. The Chairman of the Protective Committee of the First and Refunding Bonds of the Debtor, set forth the facts relied upon as showing that unless the sale of the collateral was enjoined, it would be impossible to prepare, and secure approval of, a plan of reorganization. All of the appellants contend that the injunction entered, as hereinafter stated, was without legal justification. Only the banks renew here the challenge to the jurisdiction of the court to make the order in this proceeding.

The Chicago, Rock Island and Pacific system comprises over 8,000 miles of line, extending into more than one-fourth of the states of the Union, and into 20 federal judicial districts. At the commencement of this reorganization proceeding, its capitalization outstanding in the hands of the public was $459,059,808. Of this, $128,909,211 was in preferred and common stocks; $312,365,720 in bonded indebtedness; and $17,784,877 in the collateral notes here in question. In addition to the above, there were pledged as security for some issues of its funded debt bonds and stocks of the system aggregating $145,749,050; and as security for the collateral notes, the bonds and stocks above mentioned, aggregating $54,711,465. If, pending the reorganization, trustees for the bondholders and these noteholders should sell the pledged securities, the capitalization outstanding in the hands of the public would to that extent be expanded; and the aggregate capitalization might thereby become as much as $659,520,323.

By the Act of March 3, 1933, c. 204, 47 Stat. 1467, original jurisdiction, in addition to that theretofore exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, was conferred upon courts of bank-

ruptcy " in proceedings for the relief of debtors," as provided in §§ 74, 75 and 77 of the act. We are here concerned only with § 77. That section contains provisions for the reorganization of railroads engaged in interstate commerce. It permits any railroad corporation which is insolvent or unable to meet its debts as they mature to effect a plan of reorganization.

It provides for the filing of a petition by the railroad corporation in a court designated by the act. If the petition be approved, the court, during the pendency of the proceedings, is given exclusive jurisdiction of the debtor and its property wherever located. The act requires that the railroad corporation shall be referred to in the proceedings as a " debtor," and permits any corporation, the majority of the capital stock of which is owned, or substantially all of whose properties are operated, by the debtor under lease or operating agreement, also to file a petition in the same proceeding stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization in connection with the plan of the original debtor.

Other provisions of the section direct that a plan of reorganization shall include a proposal to modify or alter the rights of creditors generally or of any class of them, secured or unsecured, either through the issuance of new securities or otherwise; that it shall provide adequate means for its execution; that the term " creditor " includes " all holders of claims, interests, or securities of whatever character against the debtor or its property "; and that, if the plan is not proposed or accepted or confirmed within a reasonable time to be fixed by the judge, he may dismiss the proceeding.

Before acceptance of any plan, the Interstate Commerce Commission is directed to hold a public hearing, following which it shall render a report recommending a plan which " will, in its opinion, be equitable, will not

discriminate unfairly in favor of any class of creditors or stockholders, will be financially advisable . . . and will be compatible with the public interest." The commission is required to state fully the reasons for its conclusions. The plan is then to be submitted to the creditors and stockholders of the debtor for acceptance or rejection. No plan may be finally approved by the commission until it has been accepted in writing by or on behalf of creditors holding two-thirds in amount of the claims of each class affected by the plan, and by or on behalf of stockholders holding two-thirds of the stock of each class.

Upon approval by the commission, the judge, after hearing, shall confirm the plan if satisfied, among other things, that the plan affords adequate protection for the realization by creditors of the value of their securities, liens and claims in one of the ways pointed out by the section. Upon confirmation of the plan, it is to be binding not only upon corporation and all stockholders and creditors generally, but upon all secured creditors of each class of which two-thirds in amount shall have accepted the plan. For convenient reference, various pertinent excerpts from § 77 are reproduced in the margin.[4]

---

[4](a) Any railroad corporation may file a petition stating that the railroad corporation is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization. The petition shall be filed with the court in whose territorial jurisdiction the railroad corporation, during the preceding six months or the greater portion thereof, has had its principal executive or operating office, and a copy of the petition shall at the same time be filed with the Interstate Commerce Commission hereinafter called the commission: . . . If the petition is so approved, the court in which such order approving the petition is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located. The railroad corporation shall be referred to in the proceedings as a " debtor." Any corporation, the majority of the capital stock of which having power to vote for the election of directors is owned, either directly or indirectly through an intervening medium,

On November 22, 1933, the district court, after a hearing, entered an order reciting that each of the collateral notes contained provisions that, in case of the insolvency

by any railroad corporation filing a petition as a debtor under this section, or substantially all of whose properties are operated by such a debtor under lease or operating agreement may file, with the court in which such other debtor had filed such a petition, and in the proceeding upon such petition under this section, a petition stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization in connection with, or as a part of, the plan of reorganization of such other debtor; and thereupon such court shall have the same jurisdiction with respect to it, its property and its creditors and stockholders as the court has with respect to such other debtor. . . .

(b) A plan of reorganization within the meaning of this section (1) shall include a proposal to modify or alter the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; . . . (3) shall provide adequate means for the execution of the plan, which may, so far as may be consistent with the provisions of sections 1 and 5 of the Interstate Commerce Act as amended, include the transfer or conveyance of all or any part of the property of the debtor to another corporation or to other corporations or the consolidation of the properties of the debtor with those of another railroad corporation, or the merger of the debtor with any other railroad corporation and the issuance of securities of either the debtor or any such corporation or corporations, for cash, or in exchange for existing securities, or in satisfaction of claims or rights, or for other appropriate purposes; . . . The term "creditors" shall, except as otherwise specifically provided in this section, include, for all purposes of this section and of the reorganization plan, its acceptance and confirmation, all holders of claims, interests, or securities of whatever character against the debtor or its property, . . .

(c) Upon approving the petition as properly filed the judge . . . (7) if a plan of reorganization is not proposed or accepted, or, if proposed and accepted, is not confirmed, within such reasonable time as the judge may, upon cause shown and after considering any recommendation which has been filed by the commission, allow, may dismiss the proceeding; . . .

(d) Before creditors and stockholders of the debtor are asked finally to accept any plan of reorganization, the Interstate Com-

of the railway company or the appointment of a receiver or the non-payment of interest when due, the holder thereof might sell and dispose of the collateral; that there was

merce Commission shall after due notice hold a public hearing at which the debtor shall present its plan of reorganization and at which, also, such a plan may be presented by the trustee or trustees, or by or on behalf of creditors of the debtor, being not less than 10 per centum in amount of any class of creditors. Following such hearing, the commission shall render a report in which it shall recommend a plan of reorganization (which may be different from any which has been proposed) that will, in its opinion, be equitable, will not discriminate unfairly in favor of any class of creditors or stockholders, will be financially advisable, will meet with the requirements of subdivision (g) of this section, and will be compatible with the public interest. In such report the commission shall state fully the reasons for its conclusions, . . . Thereafter the plan of reorganization recommended by the commission shall be submitted in such manner as the commission may direct to the creditors and stockholders of the debtor for acceptance or rejection, together with the report or reports of the commission thereon; . . .

(e) A plan of reorganization shall not be finally approved by the commission until it has been accepted in writing and such acceptance has been filed in the proceeding by or on behalf of creditors holding two-thirds in amount of the claims of each class whose claims or interests would be affected by the plan, and by or on behalf of stockholders of the debtor holding two-thirds of the stock of each class: *Provided, however,* That if adequate provision is made in the plan for the protection of the interests, claims, and liens of any class of creditors or stockholders in the manner provided in clauses (5) and (6) of subdivision (g) of this section, then the acceptance of the plan by such class of creditors or stockholders shall not be requisite to the approval of the plan; . . .

(g) Upon such approval by the commission, and after hearing such objections as may be made to the approved plan, the judge shall confirm the plan if satisfied that . . . (6) the plan provides with respect to any class of creditors the acceptance of which is requisite to the confirmation of the plan, and who would not become bound by the plan under the provisions of subdivision (h) of this section, adequate protection for the realization by them of the value of their securities, liens, and claims, either (a) by the sale of such property subject to their liens, if any, or (b) by the sale free of such liens at not less than

danger that the holders would claim that one or more of the events entitling them to sell such collateral had occurred; that a sale of the collateral or any part thereof by the Reconstruction Finance Corporation or by the banks would be inconsistent with the purposes of § 77 and would hinder, impede, obstruct, delay, and, in effect, prevent the orderly preparation and consummation of a plan of reorganization; that the district court, under § 77, had exclusive jurisdiction of the debtor and its property wherever located; that under paragraph 15 of § 2 of the Bankruptcy Act, the court had power to make such orders, issue such process and enter such judgments as might be necessary for the enforcement of the act; and that it was

a fair upset price, and the transfer of such liens to the proceeds of such sale, or (c) by appraisal and payment in cash of either the value of such liens and claims or, at the objecting creditors' election, the value of the securities allotted to such liens and claims under the plan. Section 57, clause (h), of this Act shall be applicable to the appraisal of securities under this section, and the value of the unpaid balance shall be appraised as an unsecured claim; . . .

(h) Upon such confirmation the provisions of the plan shall be binding upon . . . (7) all secured creditors of each class of which two-thirds in amount shall have accepted the plan. . . .

(l) In addition to the provisions of section 11 of this Act for the staying of pending suits against the debtor, such suits shall be further stayed until after final decree [and] the judge may, upon notice and for cause shown, enjoin or stay the commencement or continuance of any judicial proceeding to enforce any lien upon the estate until after final decree.

.        .        .        .        .

(n) In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and his property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed.

.        .        .        .        .

necessary for the enforcement of § 77 that the holders of the collateral be enjoined and restrained from selling or disposing of the same pending the preparation and consummation of a reorganization plan. Following these recitals, the Reconstruction Finance Corporation and the banks were restrained and enjoined from converting, selling or otherwise disposing of the collateral or any part thereof until further order of the court.

An appeal followed to the circuit court of appeals where, upon full consideration, the decree of the district court was affirmed. 72 F. (2d) 443. The case was brought here on certiorari.

The questions which we are called upon to determine relate to the construction of § 77 in certain particulars; to its constitutionality; and to the powers of the district court which were here asserted and exercised.

*First.* The constitutional validity of the section in its general scope and application is not assailed, the subject being passed without discussion by any of the parties. Nevertheless, grave doubt has been expressed in respect of that question; and since the question is inherently fundamental, we deem it necessary to consider and dispose of it *in limine*—postponing, however, for later consideration the limited contention of the banks, in which the Reconstruction Finance Corporation seems not to join, that the due process clause of the Constitution is infringed by the special application made of § 77 in respect of the injunction.

Article I, § 8, cl. 4, of the Federal Constitution vests Congress with the power " to establish . . . uniform laws on the subject of bankruptcies throughout the United States "; and the simple question is—does § 77 constitute a law on the subject of bankruptcies? While attempts have been made to formulate a distinction between bankruptcy and insolvency, it long has been settled that,

within the meaning of the constitutional provision, the terms are convertible. As early as 1833, Mr. Justice Story said that whatever might have been the rule of the English law on the subject, Congress might pass an act authorizing a commission of bankruptcy at the petition of the debtor; and that no distinction, practically or even theoretically, could be made between bankruptcies and insolvencies. 2 Story on the Constitution, 4th ed., § 1111. From the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power.

The English law of bankruptcy, as it existed at the time of the adoption of the Constitution, was conceived wholly in the interest of the creditor and proceeded upon the assumption that the debtor was necessarily to be dealt with as an offender. Anything in the nature of voluntary bankruptcy was unknown to that system. The persons who were permitted to fall within the term " bankrupt " were limited to traders. But the notion that the framers of the Constitution, by the bankruptcy clause, intended to limit the power of Congress to the then-existing English law and practice upon the subject long since has been dispelled.

In *Waring* v. *Clarke,* 5 How. 441, this court held that the grant extending the judicial power to all cases of admiralty and maritime jurisdiction was not limited to, and was not to be interpreted by, what were cases of admiralty jurisdiction in England when the Constitution was adopted. Nor is the implied power of Congress over the subject arising from that jurisdictional clause and the general coefficient clause (Art. I, § 8, par. 18) of the Constitution to be thus confined. *Detroit Trust Co.* v. *The Barlum,* 293 U. S. 21, 42–43; *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 385–387.

The same, it was said in the *Waring* case, is true in respect of other grants of power; and the bankruptcy clause was cited, p. 458, as an example. *In the Matter of Edward Klein,* decided by Mr. Justice Catron sitting on circuit, and printed in 1 How. 277, it was definitely decided that the extent of the power of Congress was not limited to the principle upon which the English bankruptcy system was founded; and that decision was cited with approval by this court in *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 186. Whether a clause in the Constitution is to be restricted by the rules of the English law as they existed when the Constitution was adopted depends upon the terms or the nature of the particular clause in question. Certainly, these rules have no such restrictive effect in respect of any constitutional grant of governmental power (*Waring* v. *Clarke, supra*), though they do, at least in some instances, operate restrictively in respect of clauses of the Constitution which guarantee and safeguard the fundamental rights and liberties of the individual, the best examples of which, perhaps, are the Sixth and Seventh Amendments, which guarantee the right of trial by jury. That guaranty has always been construed to mean a trial in the mode and according to the settled rules of the common law, including all the essential elements recognized in this country and England when the Constitution was adopted. *Patton* v. *United States,* 281 U. S. 276, 288, and cases cited. See, also, *Callan* v. *Wilson,* 127 U. S. 540, 549; *Dimick* v. *Schiedt,* 293 U. S. 474, 476, 487; *West* v. *Gammon,* 98 Fed. 426.

But, while it is true that the power of Congress under the bankruptcy clause is not to be limited by the English or Colonial law in force when the Constitution was adopted, it does not follow that the power has no limitations. Those limitations have never been explicitly defined, and any attempt to do so now would result in little

more than a paraphrase of the language of the Constitution without advancing far toward its full meaning. Judge Cowen, in *Kunzler* v. *Kohaus,* 5 Hill 317, 321, a decision which was approved by this court in *Hanover National Bank* v. *Moyses, supra,* said that the power was the same as though Congress had been authorized "to establish uniform laws on the subject of any person's general inability to pay his debts . . ." Probably the most satisfactory approach to the problem of interpretation here involved is to examine it in the light of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject; for, like many other provisions of the Constitution, the nature of this power and the extent of it can best be fixed by the gradual process of historical and judicial "inclusion and exclusion." Compare *Davidson* v. *New Orleans,* 96 U. S. 97, 104; *Federal Trade Comm'n* v. *Raladam Co.,* 283 U. S. 643, 648.

The first act, that of 1800, so far ignored the English law, which was confined to traders, as to include bankers, brokers and underwriters as well. The act of 1841 added merchants; and other additions have been made by later acts until now practically all classes of persons and corporations are included. See *Friday* v. *Hall & Kaul Co.,* 216 U. S. 449, 454. The act of 1800 was one exclusively in the interest of the creditor. But the act of 1841 took what then must have been regarded as a radical step forward by conferring upon the debtor the right by voluntary petition to surrender his property, with some exceptions, and relieve himself of all future liability in respect of past debts. The act of 1800, like the English law, was conceived in the view that the bankrupt was dishonest; while the act of 1841 and the later acts proceeded upon the assumption that he might be honest but unfortunate. One of the primary purposes of these acts was to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations

and responsibilities consequent upon business misfortunes," and to give him "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preëxisting debt." *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 244.

By the act of 1867, as amended by the act of 1874, c. 390, § 17, 18 Stat. 178, 182, the debtor for the first time was permitted either before or after an adjudication in bankruptcy, to propose terms of composition to his creditors to become binding upon their acceptance by a designated majority and confirmation by the judge.

The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution. Taken altogether, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day. And these acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed.

Section 77 advances another step in the direction of liberalizing the law on the subject of bankruptcies. Railway corporations had been definitely excluded from the operation of the law in 1910 (c. 412, § 4, 36 Stat. 838, 839), probably because such corporations could not be liquidated in the ordinary way or by a distribution of assets. A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the pro-

tection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become "insolvent or unable to meet its debts as they mature."

Equity receiverships, resorted to for that purpose, have never been satisfactory, for many reasons. Partly, no doubt, in recognition of that situation, Congress, by § 77, added railroad corporations to the category of those who might have relief by legislation passed in virtue of the bankruptcy clause of the Constitution; and determined, after consideration, that such relief to be effectual should take the form of a reorganization, and should extend to cases where the corporation is "unable to meet its debts as they mature." The last phrase, since it is used as an alternative for the word "insolvent," obviously means something less than a condition of "bankruptcy" or "insolvency" as those words are employed in the law. See Bankruptcy Act, § 1 (15), which defines an "insolvent" as one whose assets, at a fair valuation, are not sufficient to pay his debts. It may be construed to include a debtor who, although unable to pay promptly, may be able to pay if time to do so be sufficiently extended. Obviously, § 77 does no more than follow the line of historical and progressive development projected by previous acts.

As outlined by that section, a plan of reorganization, when confirmed, cannot be distinguished in principle from the composition with creditors authorized by the act of 1867, as amended by the act of 1874. It is not necessary to the validity of either that the proceeding should result in an adjudication of bankruptcy. The constitutionality of the old provision for a composition is not open to doubt. *In re Reiman,* 20 Fed. Cas. 490, 496–497, cited with approval in *Hanover National Bank* v. *Moyses, supra.* That provision was there sustained upon the broad ground that the "subject of bankruptcies" was

nothing less than " the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief." That it was not necessary for the proceedings to be carried through in bankruptcy was held not to warrant the objection that the provision did not constitute a law on the subject of bankruptcies. The same view sustains the validity of § 77. Both contemplate an adjustment of a failing debtor's obligations; and although actual bankruptcy may not supervene in either, they are none the less laws on the subject of bankruptcies. With due regard for consistency, the constitutional validity of the one cannot well be sustained and that of the other denied, as this court quite evidently recognized in *Canada Southern Ry. Co.* v. *Gebhard*, 109 U. S. 527.

That case involved an act of the Canadian Parliament by which railway companies unable to meet their engagements might unite with their creditors in the preparation of " schemes of arrangement " to be filed in the court of chancery. A scheme was deemed agreed to by the holders of mortgages, bonds, stocks, rent charges and preferred shares when assented to in writing by a designated majority of the holders of each class of security. The scheme when confirmed by the court became binding upon the non-assenting minority and this court held it to be thus binding upon bondholders who were citizens of the United States and who sued in courts of the United States to recover on their bonds. The " scheme " of the Canadian law was not unlike the " plan " of § 77. The significant part of the court's opinion, so far as the question now under discussion is concerned, is the following, which appears at p. 536:

" The confirmation and legalization of ' a scheme of arrangement ' under such circumstances is no more than is done in bankruptcy when a ' composition ' agreement with the bankrupt debtor, if assented to by the required ma-

jority of the creditors, is made binding on the non-assenting minority. In no just sense do such governmental regulations deprive a person of his property without due process of law. They simply require each individual to so conduct himself for the general good as not unnecessarily to injure another. Bankrupt laws have been in force in England for more than three centuries, and they had their origin in the Roman law. The Constitution expressly empowers the Congress of the United States to establish such laws. Every member of a political community must necessarily part with some of the rights which, as an individual not affected by his relation to others, he might have retained. Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty, and property. Bankrupt laws, whatever may be the form they assume, are of that character."

After pointing out that the Canadian law was in accordance with the policy of the English and Canadian governments in dealing with embarrassed and insolvent railway companies; that it took the place in England and Canada of foreclosure sales in the United States " which in general accomplish substantially the same result with more expense and greater delay," the court added (p. 539):

" . . . It is in entire harmony with the spirit of bankrupt laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations. It is not in conflict with the Constitution of the United States, which, although prohibiting States from passing laws impairing the obligation of contracts, allows Congress ' to establish . . . uniform laws on the subject of bankruptcy throughout the United States.' Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail."

It is unnecessary to consider the criticism, sometimes made, that these excerpts are *dicta* merely, since we are of opinion that they are sound in principle.

It follows, from what has now been said, that § 77, in its general scope and aim, is within the power conferred by the bankruptcy clause of the Constitution; and we so hold.

*Second.* Under § 77 does the bankruptcy court have authority to enjoin the sale of the collateral here in question if a sale would so hinder, obstruct and delay the preparation and consummation of a plan of reorganization as probably to prevent it? By § 2 of the Bankruptcy Act (U. S. C. Title 11, § 11), courts of bankruptcy are invested " with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings." They are essentially courts of equity, and their proceedings inherently proceedings in equity, the words " at law " probably having been inserted only with regard to clause (4) of § 2, which confers authority to arraign, try, and punish bankrupts and others for violations of the act. *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 240. Their adjudications and orders constitute in all essential particulars decrees in equity. *Idem,* 241. The power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a court of bankruptcy, as it is in a duly established court of equity. Section 262 of the Judicial Code, which authorizes the United States courts " to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions " recognizes and declares the principle. An example of its application is found in *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 229, where we held that a federal court, having first acquired jurisdiction of the subject matter, could enjoin the parties from proceeding in a state court of concurrent jurisdiction " where the effect of the

action would be to defeat or impair the jurisdiction of the federal court." An injunction may be issued in such circumstances for the purpose of protecting and preserving the jurisdiction of the court "until the object of the suit is accomplished and complete justice done between the parties." *Looney* v. *Eastern Texas R. Co.*, 247 U. S. 214, 221.

Moreover, by § 2 (15) of the Bankruptcy Act (U. S. C., Title 11, § 11), courts of bankruptcy are invested with such authority in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings, including the power to "make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this act." It may be that in an ordinary bankruptcy proceeding the issue of an injunction in the circumstances here presented would not be sustained. As to that it is not necessary to express an opinion. But a proceeding under § 77 is not an ordinary proceeding in bankruptcy. It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile.

The bankruptcy court, in granting the injunction, was well within its power, either as a virtual court of equity, or under the broad provisions of § 2 (15) of the Bankruptcy Act or of § 262 of the Judicial Code.

The injunction does not infringe § 67 (d), U. S. C. Title 11, § 107 (d). The substance of that provision is that *bona fide* liens shall not be affected by anything contained in the Bankruptcy Act. The injunction here in no way impairs the lien, or disturbs the preferred rank of the pledgees. It does no more than suspend the enforcement of the lien by a sale of the collateral pending

further action. It may be, as suggested, that during the period of restraint the collateral will decline in value; but the same may be said in respect of an injunction against the sale of real estate upon foreclosure of a mortgage; and such an injunction may issue in an ordinary proceeding in bankruptcy. *Straton* v. *New,* 283 U. S. 318, 321, and cases cited. A claim that injurious consequences will result to the pledgee or the mortgagee may not, of course, be disregarded by the district court; but it presents a question addressed not to the power of the court but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised. So far as constitutional power is concerned, there is no difference between an injunction restraining the enforcement of a real-estate mortgage and one restraining the enforcement of a pledge by the sale of collateral security. Such differences as exist affect not the power but the propriety of its exercise—that is to say, the discretion of the court. Such an injunction, as just indicated, is within the contemplation of § 77, and we need not inquire whether it would be admissible under the act in force prior to the adoption of that section. Compare *Straton* v. *New, supra.* Nor does § 57 (h), 11 U. S. C. § 93 (h), also invoked by petitioners, have any pertinent application to the question under discussion in the light of the provisions, purpose and aim of § 77.

Petitioners urge that the injunction is precluded by a consideration of subdivision (1) of § 77, which confers authority upon the court to enjoin or stay the commencement or continuance of any judicial proceeding to enforce any lien upon the estate until after final decree. The point made is that the granting of this express power to enjoin *judicial* proceedings brought to enforce liens negatives the authority to stay the enforcement of liens by *non-judicial* proceedings, in accordance with the maxim *expressio unius est exclusio alterius.* But clause (15) of

§ 2 is still in the act; and it would be an unwarranted use of the maxim, which is only an aid to construction, to apply it in such a way as to work a destruction, *pro tanto,* not only of that clause, but of § 262, Judicial Code, and of the general principle upon which both are based.

*Third.* It is evident that the effect here wrought by the menace of impending sales of the collateral would seriously embarrass and probably prevent the formulation and consummation of a plan of reorganization. Both courts below so found. The findings of the district court are in the form of recitals in the order, but are nevertheless in substance and in effect findings of fact. The circuit court of appeals approved these findings, and added that without some control over the disposition of the collateral, " the presentation of a satisfactory plan of reorganization might as well be abandoned." These concurrent findings of the two courts, as this court has often held, should be accepted as conclusive unless clearly erroneous. *United States* v. *Commercial Credit Co.,* 286 U. S. 63, 67; *Stuart* v. *Hayden,* 169 U. S. 1, 14; *Dun* v. *Lumbermen's Credit Assn.,* 209 U. S. 20, 23–24.

We are not impressed with the attempt of petitioners to show that the record entirely fails to justify the conclusion of the courts below in that regard. It must be borne in mind that, in addition to the collateral aggregating more than $54,000,000, held by petitioners, there was outstanding additional collateral pledged as security in the sum of over $145,000,000, bringing the total up to approximately $200,000,000, a sum equal to nearly half of the capital then issued and in the hands of the public. At the time the injunction was applied for, there was danger that the noteholders would claim that the right of sale under the terms of the collateral notes had been brought into existence; and with the pendency of the reorganization proceedings and the suspension of the payment of interest, it well cannot be doubted that there also was danger that the noteholders would proceed to exercise

their rights of sale under the collateral notes. Such action on the part of these noteholders might well precipitate similar action by other holders of pledged collateral.

It is necessary, under § 77, first to prepare a plan and then to submit it, perhaps with other suggested plans, to the Interstate Commerce Commission for consideration and recommendation. The plan having been assented to by two-thirds of each class of the stockholders and creditors and approved by the commission, must then, and only then, be submitted for approval to the district court. In the reorganization of a great railroad system like that here concerned, these various steps call for a degree of consideration and an extent of detailed work almost beyond the power of appreciation. The sale of the collateral securities from time to time during the progress of this consideration and work well might require such changes of detail in the plan, entailing new and perhaps difficult reconcilements of views among many and conflicting interests, as to force an abandonment of the proceeding.

It must be apparent, if we consider only the impressive facts set forth in the forepart of this opinion in respect of the extensive operations of the railway company and its subsidiaries, the extent, multiplicity and variety of their obligations, the complicated nature of their capital structure, the great volume of their securities held as collateral by many and widely-separated creditors, and other circumstances, that without the maintenance of the *status quo* for a reasonable length of time no satisfactory plan could be worked out. The preparation of any plan the important details of which could survive the changes in, and the consequent fluctuation and disturbance of, the financial structure, brought about by recurring sales of collateral, would seem to be a practical impossibility. Under all the circumstances, we are of opinion that the district court properly exercised its discretion in favor of respondents.

*Fourth.* We find no substance in the contention of the petitioning banks that § 77, as applied by the court below to permit an injunction restraining the sale of the collateral, violates the Fifth Amendment. The basis of the contention is that since, by the terms of the pledge, the pledgors are empowered on default to sell the collateral at such times as they may select, § 77, as thus applied, deprives them of their property—that is to say, impairs or destroys their contractual rights—without due process of law.

The Constitution, as it many times has been pointed out, does not in terms prohibit Congress from impairing the obligation of contracts as it does the states. But as far back as *Calder* v. *Bull*, 3 Dall. 386, 388, it was said that among other acts which Congress could not pass without exceeding its authority was " a law that destroys or impairs the lawful private contracts of citizens." The broad reach of that statement has been restricted (*Legal Tender Cases*, 12 Wall. 457, 549–550) ; but the principle which it includes has never been repudiated, although the extent to which it may be carried has not been definitely fixed. Speaking generally, it may be said that Congress, while without power to impair the obligation of contracts by laws acting directly and independently to that end, undeniably, has authority to pass legislation pertinent to any of the powers conferred by the Constitution, however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts. *Legal Tender Cases, supra; Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 480–482, 484; *Highland* v. *Russell Car Co.,* 279 U. S. 253, 261. And under the express power to pass uniform laws on the subject of bankruptcies, the legislation is valid though drawn with the direct aim and effect of relieving insolvent persons in whole or in part from the payment of their debts. See *Hanover National Bank* v. *Moyses, supra,* at p. 188. So much necessarily results

from the nature of the power, and this must have been within the contemplation of the framers of the Constitution when the power was granted.

The injunction here goes no further than to delay the enforcement of the contract. It affects only the remedy. As already appears, this court has upheld the power of a court of bankruptcy to stay the enforcement of the remedy under a real-estate mortgage; and the remedy under a pledge; so far as constitutional power is here concerned, presents a situation strictly analogous in character.

*Fifth.* It is next contended that the court was without power to issue the injunction in a summary proceeding. Obviously, an application for an injunction against the immediate enforcement of a remedy is not the assertion of an adverse claim. The bonds deposited as collateral were not in the hands of purchasers, but in the hands of creditors as security. That the equity which the debtor retained was a property interest, was not and could not be disputed by the creditors; nor was the claim of the creditors in respect of their rights in the collateral security or the rank of their liens questioned by the debtor. In short, no adverse claim was brought forward by either of the parties to the controversy. The only question was in respect of the creditors' remedy; and the sole point is as to the authority of the bankruptcy court to delay for a reasonable time an interference with the reorganization proceeding which would result from an immediate sale of the collateral. The court below dealt adequately with the situation, and its conclusions find ample support in the decisions. See, for example, *In re Purkett, Douglas & Co.,* 50 F. (2d) 435, 438; *John Matthews, Inc.* v. *Knickerbocker Trust Co.,* 192 Fed. 557; *Allebach* v. *Thomas,* 16 F. (2d) 853.

The Reconstruction Finance Corporation raised the question in the district court by a demurrer, asserting that the allegations of the debtor's petition were insufficient.

But in a summary proceeding, as the term itself implies, the merits of the controversy are determined without the formality in respect of pleadings which is required in actions at law or suits in equity. In such a proceeding we see no reason why the allegations of the petition may not be helped out by timely affidavits. Doubt has been expressed by lower federal courts as to the propriety of a demurrer in such a proceeding. *In the Matter of Snelling,* 202 Fed. 258, Judge Morton aptly said, "Summary procedure implies, I think, a single hearing . . . at which the merits of the controversy are investigated and decided, without much regard to the formal pleadings." See, also, *In re Rockford Produce & Sales Co.,* 275 Fed. 811, 813. In any event, we think, as against demurrer, conceding its propriety, the petition is sufficient. Pertinent allegations are epitomized in the early part of this opinion.

The contention of the petitioners that they were not given sufficient notice or a full opportunity to be heard is quite evidently without merit. They had ten days' previous notice by registered mail of the application for the injunction. All appeared specially and participated in the hearings, for which ample time was allowed. Briefs were filed on both sides, and additional memoranda were presented to the court by the Reconstruction Finance Corporation and one of the banks.

*Sixth.* The territorial jurisdiction of the district court is assailed by three of the banks on the ground that they were located outside the Northern District of Illinois. The contention is that the district court was without power to issue its process for service outside the district. Section 77 (a) provides that after the petition of the railroad company is approved, "the court in which such order approving the petition is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the

debtor and its property wherever located." Congress may authorize the civil process of a federal district court to be served upon persons in any other district. *Toland* v. *Sprague,* 12 Pet. 300, 328; *United States* v. *Congress Construction Co.,* 222 U. S. 199, 203–204; *First Nat. Bank* v. *Williams,* 252 U. S. 504, 510. There are other cases to the same effect, but it is unnecessary to cite them. Section 77 deals with railway corporations whose lines and activities are not confined to a single district or a single state, but in numerous instances reach into many districts and many states. The lines of the Rock Island system extend into 20 districts and 14 States. Jurisdiction over reorganization proceedings, however extensive the railway lines may be, is conferred upon a single district court. The usefulness of the section would be greatly minimized and in some instances destroyed if that court were powerless to send its process into any State when necessary to effectuate the purposes of the law. As has already been shown, the equity in the collateral remaining in the railroad company is property; and over this property, wherever located, the federal district court is given exclusive jurisdiction by the precise language of § 77, just quoted. As a necessary consequence of that jurisdiction, the court must have the power to preserve and safeguard the property for the benefit of the trust estate so far as that is compatible with the rights of the pledgees. Jurisdiction over the property wherever located carries with it jurisdiction to enjoin, in a proper case, interferences with the property, and this includes, by necessary inference, the power to send process to that end for service upon the persons to be enjoined wherever they may be found within the United States.

It is said that the words "wherever located" mean wherever located *within the district.* But considering the nature of the property involved, the number of districts and states over which it is distributed, and the

manifest policy of avoiding ancillary administration as far as possible, a construction so narrow must be rejected as at war with the whole spirit and purpose of the law.

*Seventh.* The Reconstruction Finance Corporation contends that §§ 77 and 2 (15) of the Bankruptcy Act must be limited by the provisions of § 5 of the Reconstruction Finance Corporation Act (c. 8, 47 Stat. 5), which empowers the corporation to take over and *liquidate* collateral accepted by it as security. The Reconstruction Finance Corporation Act creates a corporation and vests it with designated powers. Its entire stock is subscribed by the government, but it is none the less a corporation, limited by its charter and by the general law. The act does not give it greater rights as to the enforcement of its outstanding credits than are enjoyed by other persons or corporations in the event of proceedings under the Bankruptcy Act. The provisions and principles of enforcement of the Bankruptcy Act, including § 77, are binding upon the Reconstruction Finance Corporation, in the absence of some pertinent statutory exception, as they are upon other corporations. We are unable to find such an exception in the authority to liquidate collateral held as security—an authority enjoyed in common with any other lender of money who has taken the trouble to provide for it in his contract with the borrower. What is given to the lender in either event is a remedy which, when subject to the control of the bankruptcy court under given circumstances in the one case, is equally so in the other.

*Finally.* Petitioners insist, with much force, that the injunction, granted in November, 1933, and still operative, is likely, if continued, to result in irreparable injury. We do not interpret the order, as suggested by the Reconstruction Finance Corporation, as continuing the injunction in force until a plan of reorganization is effected or the proceeding under § 77 dismissed. On the contrary,

we understand that the injunction may at any time be dissolved upon application and proper notice and showing. It contemplates, as we have already suggested, only reasonable delay.

It is true that no plan has yet been consummated; and, so far as the record shows, none has been prepared or is in the course of preparation. If this long delay were without adequate excuse, the retention of the injunction for the long period which has intervened since it was granted could not be justified. But the delay is obviously due to the many doubts and uncertainties arising from the present litigation. Until they are finally resolved, the consummation, or even the preparation, of any definite plan is plainly impracticable. With those doubts and uncertainties now removed, the proceeding should go forward to completion without further delay, or be dismissed.

The delay and expense incident to railroad receiverships and foreclosure sales constituted, probably, the chief reasons which induced the passage of § 77; and to permit the perpetuation of either of these evils under this new legislation would be subversive of the spirit in which it was conceived and adopted. Not only are those who institute the proceeding and those who carry it forward bound to exercise the highest degree of diligence, but it is the duty of the court and of the Interstate Commerce Commission to see that they do. Proceedings of this character, involving public and private interests of such magnitude, should, so far as practicable, be given the right of way both by the court and by the commission, to the end that they may be speedily determined.

*Decree affirmed.*

Mr. Justice Brandeis took no part in the decision of this case.