## In re WOLVERINE BUMPER & SPECIALTY CO.

### Nos. 5959, 5982.

District Court, W. D. Michigan, S. D.
April 29, 1938.

Fred P. Geib, of Grand Rapids, Mich., for reviewing petitioners.

Gillard & Gillard, of Grand Rapids, Mich., for bankrupt.

Warner, Norcross & Judd, of Grand Rapids, Mich., for Michigan Bumper Co.

RAYMOND, District Judge.

By means of a petition of certain creditors for administration and distribution of alleged unadministered assets and of a petition for consolidation of voluntary and involuntary proceedings in bankruptcy (which petitions were referred to the referee in bankruptcy), and by petition of creditors for review of the order of the referee denying the prayers of both petitions, attention of the court has been directed to a course of proceeding under the Bankruptcy Law which cannot be approved.

The report of the referee renders unnecessary detailed review of the history of these proceedings. A chronological statement of certain of the salient facts will suffice.

On November 8, 1934, in proceedings before the Michigan Securities Commission it was represented under oath by officers of

bankrupt that the assets of bankrupt which had been assigned through a trustee to the Michigan Bumper Corporation were of the value of $479,000, and that the claims of approximately 180 creditors (including one of the president, A. P. Crell, of $85,000) amounted to about $190,000. Upon this representation the Commission approved for sale to the public shares of the new company which was incorporated November 8, 1934, with A. P. Crell as president, for the purpose of becoming bankrupt's successor. These shares were soon thereafter offered to the public and within ten days had been readily sold. Of the shares approved for sale, 183,000 were allocated to be sold for cash for use in payment of creditors of bankrupt in full. On November 16, 1934, involuntary proceedings were filed against bankrupt. On November 23, 1934, an order was made by the Kent Circuit Court setting aside the transfer of bankrupt's assets to Michigan Bumper Corporation. The order did not, however, set aside the transfer of a license agreement under certain patents nor was the sale of stock of the Michigan Bumper Corporation to the public, or the proceeds of such sale, in any way affected by the order. Rights under the license agreement apparently remained in the Michigan Bumper Corporation, as well as the proceeds of the sale of its stock. On December 3, 1934, a petition in voluntary bankruptcy was filed by bankrupt, upon which adjudication was made. In the schedules filed in these proceedings, the assets were listed at a value of $167,000.

In these voluntary proceedings, no disclosure was made of the existence of a fund which had been created through the sale of stock of the Michigan Bumper Corporation for the purpose of paying creditors of Wolverine in full. It appears that none of the stock subscriptions was cancelled; that none of the money or securities paid in on the subscription was returned to the subscribers; and that substantially all of the subscriptions were made good when title to the assets of bankrupt had again become vested in the Michigan Bumper Corporation through sale in the bankruptcy proceedings for a consideration of $129,000 to a trustee who immediately conveyed to the successor corporation.

The funds which had been raised through the sale of stock were used to bring about a settlement with about 167 creditors at fifty cents on the dollar, while other large creditors, including A. P. Crell, the president of bankrupt, and who appears to have dominated all of the proceedings, were paid in full, either in stock in the Michigan Bumper Corporation or in cash.

It appears also that a creditors' committee accepted $2,062 from the funds so raised in compensation for its services in procuring assignments of claims of creditors at fifty cents on the dollar and later conveying them to a trustee who was evidently an agent or trustee for Michigan Bumper Corporation. These transactions appear to have been without the knowledge of the bankruptcy court and were not reported to the court. The creditors' committee later unsuccessfully carried on a suit in the state courts to recover additional compensation from the trustee.

It is clear that through these purchases of claims, the Michigan Bumper Corporation and A. P. Crell were completely in control of the proceedings. Minority creditors were powerless throughout and received, finally, approximately thirty-three cents on the dollar.

The entire record is convincing that all proceedings so far as they related to the disposition of assets of bankrupt and their transfer to the Michigan Bumper Corporation were completely under the domination and control of A. P. Crell as the representative of bankrupt and that as president and manager he still directs the affairs of the successor corporation. The net result of the proceedings has been the transfer of the assets of bankrupt to a new corporation and the elimination of creditors of the old corporation, some at 33%, others at 50%, and a few, including A. P. Crell, at 100%.

The record now before the court discloses misuse of the Bankruptcy Act, the evident purpose of the proceedings being to effect a re-organization under ownership, management and control substantially identical to that of bankrupt (a procedure clearly possible under proper safeguards under section 77B, 11 U.S.C.A. § 207). But here, under guise of a voluntary bankruptcy proceeding (the accepted purpose of which is that debtor is bound to surrender and schedule all of its property for the benefit of its creditors in exchange for relief from its obligations), the bankrupt has at all times retained absolute control of the proceedings and property for its own benefit and has continued throughout the proceedings to carry on its business, and the agencies of the bankruptcy court were induced to and did become subservient to bankrupt's de-

sires. To insure this control, a creditors' committee was persuaded, for a substantial consideration, to solicit and assign claims to those under direct control of bankrupt, oblivious of the committee's duty to serve no more than one master.

Regardless of intent, it is clear that the ultimate effect of the series of transactions was to hinder, delay, and defraud creditors; that, as against creditors, the bankruptcy proceeding was used as a threat of liquidation while the business continued at all times to operate without change of management, was assured of continued rights under certain patents without which the business would be of slight value, and preserved its good will and going value.

The essence of the plan seems to have been to settle with certain creditors on the basis of liquidating values, and at the same time to preserve intact for bankrupt or its successor the going concern values. Meanwhile, bankrupt's successor received for its own benefit the dividends paid on the assigned claims. The Bankruptcy Act which must be administered on equitable principles cannot be used to effect such purpose.

▉ Where such perversion of the fundamental principles of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., is brought to the attention of the court by creditors, a finding of either fraudulent intent or wrongful purpose is not a prerequisite to relief. Such proceedings even for the laudable purpose of saving a business for its owners cannot be countenanced.

▉ The general provisions of the Bankruptcy Act, the section authorizing compositions, section 12, 11 U.S.C.A. § 30, and the provisions of section 77B were in full force and effect when this proceeding was instituted. These are sufficient to meet the varying needs of distressed business, but must always be under the control and direction of the court and with due recognition of the fundamental right of creditors and stockholders to equal and impartial consideration.

In none of its provisions does the Bankruptcy Act sanction the control of proceedings by the debtor or the use of the law for the purpose of hindering and delaying creditors. The rights of creditors to have the bankruptcy court control the proceedings throughout are evidenced by the following authorities:

" * * * A distinct purpose of the bankruptcy act is to subject the administration of the estates of bankrupts to the control of tribunals clothed with authority and charged with the duty of proceeding to final settlement and distribution in a summary way, as are the courts of bankruptcy. Creditors are entitled to have this authority exercised. * * *

"We think it is a necessary conclusion from these and other provisions of the act that the jurisdiction of the bankruptcy courts in all 'proceedings in bankruptcy' is intended to be exclusive of all other courts, and that such proceedings include, among others, all matters of administration, such as the allowance, rejection, and reconsideration of claims, the reduction of the estates to money and its distribution, the determination of the preferences and priorities to be accorded to claims presented for allowance and payment in regular course, and the supervision and control of the trustees and others who are employed to assist them." U. S. Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 217, 218, 32 S.Ct. 620, 625, 56 L. Ed. 1055.

"The purpose of the Bankruptcy Act (11 U.S.C.A.) passed pursuant to the power of Congress to establish a uniform system of bankruptcy throughout the United States, is to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors. The filing of the petition is an assertion of jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. This jurisdiction is exclusive within the field defined by the law, and is so far in rem that the estate is regarded as in custodia legis from the filing of the petition. * * *" Straton v. New, 283 U.S. 318, 320, 51 S.Ct. 465, 466, 75 L.Ed. 1060.

"* * * The proper purposes of a bankruptcy act like the present are—First (and this was its original purpose), to enable creditors to protect themselves by summary process against the frauds of their debtors in evading the payment of debts; second, to distribute the assets of the debtor equally among his creditors; and, third, to relieve debtors from the burden of debts which, through business misfortunes and otherwise, they have incurred, and which they are unable to pay. * * *" Leidigh Carriage Co. v. Stengel, 6 Cir., 95 F. 637, 647.

"The purpose of a voluntary proceeding in bankruptcy is in consideration that the

bankrupt promptly surrender all of his non-exempt property to the bankrupt court, to the end that all of his creditors, without preference or priority, may take share and share alike in percentage of the property thus surrendered; then the bankrupt is given an acquittance of such percentages of his debts not thus paid, and may commence his business life anew. * * *" Baylor v. Rawlings, 8 Cir., 200 F. 131, 133.

"* * * The primary purpose of the Bankruptcy Act, as of the insolvency laws of the state, is to give to all unsecured creditors the same percentage of their claims * * *." Farnsworth v. Union Trust & Deposit Co., 4 Cir., 272 F. 92, 94.

■ In the present case, the court has a clear duty to apply the principle that the bankruptcy court, being a court of equity, must look through the form to the substance of the transaction. See In re Knickerbocker Hotel Co., 7 Cir., 81 F.2d 981. Bankrupt has used its own assets to purchase claims of creditors at a heavy discount and to pay a creditors' committee for its services in procuring acceptance of its offer for claims, the amount to be paid the committee being contingent upon its degree of success in obtaining claims. It has then used the claims to control the proceedings.

■ It is common knowledge that persistent efforts are now being made to avoid or pervert the proper use of the provisions of section 77B and kindred sections of the Bankruptcy Act and to perpetuate the evils of collusive federal equity receiverships which this section was designed to cure, and courts have already noted such improper use in similar situations. See Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & P. Railway Co., 294 U.S. 648, 685, 55 S.Ct. 595, 610, 79 L.Ed. 1110; In re Chicago, R. I. & P. Railway Co., 7 Cir., 72 F.2d 443; and In re Utilities Power & Light Corporation, 7 Cir., 91 F.2d 598.

In the case of In re Nash, D.C., 249 F. 375, it is said that bankruptcy courts were not created for the purpose of aiding men to delay their creditors. Here as in Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873, is a case "the circumstances of which call strongly for the principle that equality is equity" (page 427) and

recognition that this is the spirit of the bankruptcy law.

■ An order may be presented for signature setting aside the orders of the referee, setting aside the sale of bankrupt's assets to the Michigan Bumper Corporation and revesting title thereto in the trustee in bankruptcy for the benefit of creditors, and providing for consolidation of the proceedings in voluntary and involuntary bankruptcy now pending, provided, however, that such order shall be upon the condition that, if payment shall be made within thirty days from the date of the order by the Michigan Bumper Corporation to the trustee in bankruptcy of a sufficient amount of money to pay in full all scheduled claims against bankrupt which have not already been paid in full, with interest at 5% from date of adjudication, less any payments made for assignments thereof or any dividends received thereon, the said order shall be of no further force or effect. The order will further provide that within ten days from the date thereof notice of said order shall be served by registered mail upon all said creditors, the notice to provide, as to creditors whose claims were assigned, that upon showing (within three months from date of the order) by affidavit or otherwise to the satisfaction of the court, that the assignment was made without full disclosure to such creditor of all material facts, such creditor shall be entitled to payment of the balance of his claim in full with interest as aforesaid. Any sums remaining in the hands of the trustee after payment in full with interest of all claims to the scheduled creditors, less dividends received thereon, which claims were not assigned, and after payment in full with interest of all assigned claims less payment for assignment thereof upon which satisfactory showing has been made within the time limited as aforesaid, after four months from said date shall be refunded to Michigan Bumper Corporation, after deduction therefrom of the expenses incurred in carrying out the provisions of the order. In event said payment shall not be made, and title to the transferred assets shall revest in the trustee in bankruptcy, the trustee shall hold title thereof for the benefit of all scheduled creditors whose claims have not been paid in full.