**In re WARNER–QUINLAN CO., Inc.**

District Court, S. D. New York.

Dec. 16, 1936.

Goldwater & Flynn, of New York City (Monroe Goldwater and Nathan Goldstein, both of New York City, of counsel), for Alexander Weinstein and Frank R. Galgano.

Proskauer, Rose & Paskus, of New York City (Norman S. Goetz and Bernard D. Lang, of New York City, of counsel), for debtor.

Frueauff, Burns, O'Brien & Ruch and Wagner, Quillinan & Rifkind, all of New York City (Henry L. O'Brien and Simon H. Rifkind, both of New York City, of counsel), for Cities Service Co. and Cities Service Oil Company.

Chadbourne, Stanchfield & Levy and Benjamin A. Hartstein, all of New York City (C. B. Hughes and Benjamin A. Hartstein, both of New York City, of counsel), for Bondholders' Committee.

Arthur Garfield Hays and Raymond L. Wise, both of New York City (Arthur Garfield Hays, Alan S. Hays, Raymond L. Wise, and Melville E. Greenewald, all of New York City, of counsel), for Bondholders' Protective Committee and Fidelity Investment Ass'n.

Archibald Palmer, of New York City, for Bernard Cappadona.

Weinstein & Levinson, of New York City (Frank Weinstein, of New York City, of counsel), for intervening bondholders.

Percival E. Jackson, of New York City, for Preferred Stockholders of Lancaster Asphalt, Inc.

Arthur T. Vanderbilt, of Newark, N. J. (Arthur T. Vanderbilt and H. Edward Toner, both of Newark, N. J., of counsel), for Standard Oil Co. of New Jersey and Swan-Finch Oil Corporation.

David M. Palley, of New York City, for stockholders.

**HULBERT, District Judge.**

This proceeding is under section 77B, Bankr. Act, as amended (11 U.S.C.A. § 207).

The pertinent question before the court for consideration and disposition is an application by the trustees of the debtor for an order authorizing them to accept an offer submitted by Gulf Oil Company, which reads as follows:

"Gulf Oil Corporation
"New York Sales Division
"17 Battery Place
"New York
"October 22, 1936

"Messrs. Alexander Weinstein & Frank R. Galgano

"Trustees for Warner-Quinlan Company
"2 Park Avenue
"New York, N. Y.

"Gentlemen:

"We hereby offer to purchase the fee properties and leaseholds listed on the attached schedules together with equipment and improvements thereon; also all rights, title and interest in and to all contracts and equipment agreements with approximately 400 gasoline tank wagon dealer and consumer accounts of the Estate of Warner-Quinlan Company, its subsidiaries or affiliates for the sum of $4,125,000. Such amount will be paid you in cash.

"In the event that the above offer is accepted by the Trustees of the Estate of Warner-Quinlan Company and approved by the court it is understood that these properties, leaseholds and dealer business will be conveyed to us or assigned to us, as the case may be, free and clear of all liens and encumbrances affecting marketable title thereto.

"We realize that in view of the present status of the Warner-Quinlan Company, time will be required to consider and accept this proposal. Accordingly, we hereby advise you that this offer will remain open to you for a period of 45 days.

"It is understood that upon acceptance of this offer our regular purchase contract will be submitted for your formal acceptance and approval by the court.

"We shall be pleased to meet with you and any other duly authorized representative of the Estate to discuss the details of this offer.

"Yours very truly,
"Gulf Oil Corporation
"By: [Sgd] M. N. Weir."

The only notice given, except to the attorneys who have appeared in this proceeding, was by publication in the Daily News Record, New York Times, and Chicago Tribune.

When the trustees' petition came on for hearing, the debtor opposed the same. Cities Service Company, owner of a substantial portion of the outstanding bonds of the debtor, and a majority of its outstanding common stock, as well as its principal general creditor, while questioning the binding force of the offer, itself submitted a bid in precisely the same terminology, except that it increased the amount of the offer to $4,175,000.

All other parties in interest who have heretofore intervened appeared on said application and favored its acceptance.

The court thereupon adjourned the hearing for the purpose of enabling counsel to prepare and submit a definitive form of contract and upon submission thereof, Cities Service Company formally withdrew its offer and, joined by Cities Service Oil Company (corporate name changed from Crew Levick Company), also claiming to be a substantial creditor, united with the debtor challenging the power of the court.

The Warner-Quinlan Company was incorporated some 30 odd years ago and is a corporation existing under the laws of the state of Maine.

Primarily, it engaged in the asphalt business. In 1912 it built a refinery and tank farm upon water-front property at Warners, N. J. In 1925 Frankel Brothers acquired control of the company and extended its activities, acquiring producing fields in Mexico and Texas, filling stations in New York and New Jersey, and also embarked into and carried on a fuel oil business.

The service stations which are the subject-matter of this application are operated by the debtor, or wholly owned subsidiaries, upon property either owned in fee or leasehold, as follows:

| "Name | Fee | Lease-hold |
|---|---|---|
| 1. Warner-Quinlan Co. | 5 | 36 |
| 2. Mileage Gas Corporation* (New York Corporation) | 57 | 69 |
| 3. Girard Leaseholding Co. Inc.** (New York Corporation) | | 6 |
| 4. Henry Oil Company* (New Jersey Corporation) | 2 | |
| 5. Municipal Service Real Estate Corp.** (New York Corporation) | 53 | |
| 6. Municipal Gasoline Stations, Inc.** (New York Corporation) | | 3 |
| | 117 | 114 |

"*The debtor owns 100% of the shares of the outstanding capital stock.
"**All of the outstanding shares are owned by Municipal Service Corp., a New York Corporation, all of whose stock is in turn owned by the debtor."

The debtor also owns (inter alia) the following subsidiaries: Polo Grounds Garage, Inc., a New York corporation; Montezuma Terminal Co., S. A., a corporation organized under the laws of Mexico; Mexican Atlas Petroleum Co., S. A., a corporation organized under the laws of Mexico; Warner-Quinlan Company of Texas, a Texas corporation; and Lancaster Asphalt, Inc., a Delaware corporation.

Municipal Service Corporation also owns (inter alia) the following additional subsidiaries: Utility Oil Company, a New York corporation, and Petroleum Investing Corporation, a New York Corporation.

On October 11, 1935, the debtor filed in this court a voluntary petition under section 77B, as amended, 11 U.S.C.A. § 207, wherein it was disclosed that on or about October 2, 1935, an involuntary petition under section 77B had been filed in this court by three persons claiming to be owners in the aggregate of $7,000 principal amount of the 10-year 6 per cent. convertible gold debentures of the debtor.

The debtor filed an answer to said involuntary petition denying insolvency and no further proceedings appear to have been taken with respect to the issues raised thereby, but, on the contrary, Mr. Hartstein, the attorney who filed said petition, assented to the approval of the debtor's petition and the continuance of the debtor in possession. The debtor's petition set forth: "For several years past the debtor has sustained repeated annual losses and has been enabled to continue its operations only through repeated loans in large amounts which have been made available to the debtor by the said Cities Service Company, its largest stockholder * * * As a result of repeated annual losses, the working capital of the debtor has been

impaired, making the continued operations of the debtor entirely dependent upon fresh borrowings. The debtor is no longer in a position to continue such borrowing, and therefore, unless the protection of the court is had the debtor may not be in a position to continue operations. Due to abnormal conditions in the debtor's industry, and the debtor's recent losses, the ordinary channels for borrowing are not available to the debtor. The debtor, however, owns fixed assets of large value, so long as it continues as a going concern. At a fair valuation on a going business basis the aggregate of the assets of the debtor exceeds the aggregate of its liabilities. If, however, the operations of the debtor are discontinued and a forced sale of its assets is necessitated, it is problematical whether the proceeds from such a sale will be sufficient to pay in full the claims of creditors of the debtor, and the investment of stockholders may be entirely lost."

It definitely appears that the debtor is not an integral unit in the oil industry. It does not produce for its own use, but must rely upon its ability to purchase in the market substantially all of its gasoline and oil requirements to supply its service stations and maintain them as a going concern, whereas other large companies in the industry require stations as an outlet to dispose of their production from the wells and refineries.

Upon the approval of the debtor's petition, it was represented to the court that Cities Service Company had an option to purchase from Gulf Oil Company the anticipated requirements of the debtor for a period of one year, and that *immediate* action was essential as said option was about to expire. The proposed contract involved a very substantial change in the policy of the debtor which the directors had had under consideration for several months and as the anticipated purchases were estimated at about $4,000,000, the court was reluctant to proceed with the undue haste urged upon it. An extension of the option was obtained and the court called into conference Mr. Alexander Weinstein, a consulting engineer, maintaining an extensive organization for the purpose, inter alia, of advising corporations encountering difficulty in weathering storms of financial stress.

As a result of inquiries, analyses, and suggestions made by Mr. Weinstein, the proposed contract was modified in material respects, executed, and has been fully performed and it has been conceded by all parties concerned that it provided the life blood which has sustained the debtor as a going concern during the period of these proceedings. In fact, the contract has been renewed, after having been first passed upon by Cities Service Company and counsel for all of the other interveners.

It had been suggested that the court appoint a committee to act in co-operation with the debtor in possession pending the preparation and submission of a plan of reorganization.

In that connection, the court considered the availability of Mr. Weinstein and Frank R. Galgano, Esq., who also assisted in overcoming legal obstacles to the proposed original Gulf contract, and invited the interested parties to suggest names of additional persons in connection with the formation of such a committee.

Meanwhile, counsel for the debtor made application to the court for instructions with respect to whether the debtor should interpose an answer in a suit brought in the Supreme Court of the state of New York, New York county, by certain of its stockholders against the debtor and others, wherein an accounting was sought from various of the officers and directors of the debtor and other corporations and persons, who were charged with waste and mismanagement, and with conspiracy to defraud the corporation and its stockholders.

The criminations and recriminations exchanged upon the argument of that application prompted the court to doubt whether it had acted wisely in continuing in possession the debtor, against some of whose officers the charges in question had been directed, and an order was made on December 13, 1935, appointing Hon. Jeremiah T. Mahoney, former Justice of the Supreme Court of New York, as special master for the purpose of ascertaining and reporting to the court if there was any relationship on the part of any officer of the debtor inconsistent with his being continued in charge of the affairs of the debtor as an officer thereof and whether there had been any act upon the part of any officer of the debtor which would make him ineligible to continue in such capacity. In order that the evidence before the special master would be fairly and impartially presented, the court appointed James A. Martin, Esq., a member of the bar of

this court, to conduct the examination, and abandoned the consideration of the appointment of the suggested committee.

On December 13, 1935, the court, by order, fixed February 15, 1936, as the date on or before which a plan of reorganization should be submitted herein.

An application was made by the debtor for the appointment of a certified public accountant for the purpose of making an exhaustive audit of the debtor's books, which it was claimed by all parties concerned, was essential for the purpose of making it possible to prepare and present a plan of reorganization, and an order was made on January 23, 1936, authorizing the employment of S. D. Leidesdorf & Co., of New York, at an expense not to exceed $7,500, without further application to the court. Subsequently the court was informed that the Leidesdorf firm could not have its report ready by the 15th of February, and that moreover the allowance of $7,500 was inadequate for the services which they were required to perform, and an order was made increasing the authorization to $15,000 and extending the time for the presentation of a plan of reorganization to April 15, 1936. The accountants having reported that their report would not be finished until April 22, the time for the submission of the plan was further extended to June 15, and that the accountants performed extensive services is at least evidenced by the fact that they have presented to the court a bill for $28,-074.41.

On or about June 15, 1936, a plan of reorganization of the debtor dated June 1, 1936, was proposed by Cities Service Company as the holder of not less than 25 per cent. in amount of claims of creditors and not less than 10 per cent. in amount of all the claims against the debtor. Attached to the plan, filed with the court on June 25, 1936, is a condensed consolidated balance sheet of the debtor and subsidiary companies as at October 11, 1935 and December 31, 1935, prepared by S. D. Leidesdorf & Co., which clearly reflects the insolvency of the debtor.

The plan of reorganization set forth: "The debtor showed a consolidated loss for the year 1934 in the sum of $1,884,-938.52, as audited by Messrs. Price, Waterhouse & Co. * * * (and) for the year 1935 of $2,804,012.30, as audited by Messrs. S. D. Leidesdorf & Co.," and proposed that all of the assets of the debtor, including the stock of its subsidiaries, should be conveyed to a nominee of Cities Service Company; priority and lien claims, other than mortgage claims, duly filed to be paid in full in cash as allowed; the lien of any mortgages and the rights of mortgagees not to be affected by the plan; unsecured claims duly filed and finally allowed in the sums of $100 or less, to be paid in full in cash; unsecured claims (including the debtor's debentures) duly filed and allowed for sums in excess of $100 to be given securities, viz., for each $3,000 of claims against the debtor, $1,000 in principal amount of Cities Service Company 5 per cent. debentures of 1950, and 40 shares of Cities Service Company common stock.

The plan then sets forth: "The Company being insolvent, stockholders of the Debtor shall receive nothing for their shares."

The proposed plan then refers to the issued and outstanding 10-year 6 per cent. convertible gold debentures of the debtor, in the principal amount of $6,160,000; and that as of the date of the institution of these proceedings there was due to Cities Service Company and its subsidiaries a sum in excess of $6,500,000 representing cash advances, merchandise claims, open accounts, etc., unsecured except that $950,-000 of notes of subsidiaries of the debtor had been deposited as collateral for part of said indebtedness; that all of the common stock of Lancaster Asphalt, Inc., was owned by the debtor but $161,400 par value of 7 per cent. preferred stock was held by others upon which semiannual dividends had been paid up to and including November 1, 1935. (The debtor had guaranteed the payment of dividends at rate of 7 per cent. per annum to the holders of said preferred stock and had also guaranteed the payment by redemption of said preferred stock on May 1, 1939, at 105 per cent.) That unsecured claims due to wholly owned subsidiaries for advances, merchandise claims, open accounts, etc., had been filed with Referee Kurtz as special master, in the sum of $744,164.59 and that unsecured miscellaneous and trade claims had likewise been filed in a sum in excess of $520,-000; that landlords have filed liquidation claims aggregating $70,263.53 and in addition unliquidated claims have been filed by three landlords. The debtor had guaranteed mortgages of subsidiaries in the sum of $56,166.67, in addition to which there were mortgages payable on the debtor's

property, aggregating $235,090; that Swan-Finch Oil Corporation and Standard Oil Company of New Jersey had filed a claim upon a judgment recovered in the New Jersey courts (upon which a right of appeal had been exhausted to the United States Supreme Court, Warner-Quinlan Co. v. Swan-Finch Oil Corp., 296 U.S. 621, 56 S.Ct. 142, 80 L.Ed. 441) in the sum of $450,302.72; miscellaneous, secured and priority claims aggregating approximately $60,000 had been filed, representing mechanics' liens, pledges of bonds, or otherwise entitled to priority; tax claims had been filed aggregating approximately $25,000, and, finally, that there were issued and outstanding 759,538 shares of common stock of the debtor, approximately 54 per cent. of which was owned by said Cities Service Company.

It was conceded that on the basis of the proposed settlement, those creditors not entitled to payment in full would receive in securities of Cities Service Company, approximately the equivalent of 34 per cent. of their claims at the then market value, or 39 per cent. or 40 per cent. at par value, although the market value of said securities has since declined on an otherwise rising market.

The proposed plan provided that the transfer date for the conveyance of the assets should be not less than 45, nor more than 60 days after the confirmation of the plan. Substantially all of the interveners favored the acceptance of the plan.

Upon the application now before me, Mr. Hays has submitted an affidavit setting forth that based upon the book value of the assets and liabilities, the service stations had a proportionate value of $481,667.10 under the plan.

It must not be overlooked, however, that the proposed purchaser would accept delivery of the properties subject to existing liens aggregating nearly $2,000,000.

However, the plan contained two suggestions to which the court took exception:

Cities Service Company reserved the right to withdraw the plan without any obligation of any kind on its part in the event that (a) any change takes place, except in the ordinary and usual course of business, in the personnel, operation, and management of the debtor's affairs and estate, including but not limited to an appointment of trustee or trustees of the debtor's estate, and (b) the debtor shall agree, in writing, simultaneously with the transfer of assets, that appropriate proceedings will be taken for the purpose of changing its name to a name of which the words "Warner-Quinlan" shall not be a constituent part (the right to use said name to be transferred with the assets referred to in section II) ; and after the transfer of assets, appropriate proceedings would be taken for the dissolution of the debtor.

On June 23, 1936, Judge Mahoney filed his report in which he had answered the questions referred to him, in the affirmative, and at an adjourned hearing held on July 1, 1936, the report of the special master was confirmed, the debtor in possession was removed and Alexander Weinstein and Frank R. Galgano were appointed trustees, and duly qualified by filing an approved bond in the sum of $100,000.

Mr. Palmer, representing bondholders, thereupon moved: (1) For a dismissal of the proceeding; and (2) for an order of liquidation.

The court reserved decision. To have granted the former motion would have put the custody of the assets of the debtor back into the hands of the very persons whose removal the special master had recommended.

As to (2). In fairness to the trustees, they were permitted to continue the business, since the court had expressed the hope that, the Cities Service plan having been withdrawn, either the debtor, or some other group of creditors, might feel disposed, and should have a reasonable opportunity, to present a plan.

The court directed the trustees to make a thorough survey and to furnish any of the interveners with the results to better enable them to consider and prepare a plan of reorganization.

The proceeding was, accordingly, adjourned from time to time, upon the request of the interveners who assured the court that they were constantly in conference with that purpose in mind. Moreover, the trustees reported, at each of these hearings, first, that the losses had diminished and that finally the operations of the business had shown an operating profit. They also reported as a result of their survey, that the disposition of the service stations would eliminate a loss of from $30,000 to $50,000 per month and would there-

by increase the operating profits without disintegrating the business, so that, on December 2, 1936, Mr. Hays, acting on behalf of all the interveners, except the Cities Service interests, presented what he termed, a "plan of reorganization" based upon the sale of the service stations, in which event it was claimed that from the operation of the asphalt and fuel oil business the creditors would receive substantially 100 cents on the dollar.

The document presented by Mr. Hays is not a plan within the act. It does not bear the signature of any creditor. Accompanying it is a petition made by counsel for the interveners, other than Cities Service interests, and verified by one of them, but it is stated by counsel for the interveners that, although they worked in cooperation with the debtor for more than a year, they were without the names and addresses of stockholders or bondholders sufficient in number to obtain the required statutory percentage of either class, and have, on the hearing of this application, requested that an order be made directing the debtor and the trustees to furnish them with whatever names and addresses are available. This motion I have granted.

By the reorganization sections added to the General Bankruptcy Act, the Congress extended the jurisdiction of courts of bankruptcy "for the relief of debtors" at a time when the country was in the throes of widespread financial distress and it is apparent that the Congress intended to provide for extraordinary powers to deal with extraordinary situations.

Section 77 of the Bankruptcy Act (11 U.S.C.A. § 205) was liberally construed by the United States Supreme Court in the so-called Rock Island Case (Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 55 S. Ct. 595, 79 L.Ed. 1110) which can as reasonably be applied to section 77B because of its analogous language. See, also, In re Greyling Realty Corporation (C.C.A. 2) 74 F.(2d) 734. In Grand Boulevard Investing Co. v. Strauss (C.C.A. 8) 78 F.(2d) 180, Booth, C. J., analysed and emphasized the additional powers specifically conferred under section 77B.

It is to be noted, however, that these powers are dependent upon, attached to, and arise out of the plan of reorganization.

The debtor is one of those corporations authorized to file a petition pursuant to section 77B (a), 11 U.S.C.A. § 207(a) upon setting forth, among other requirements that: "* * * the corporation is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization."

Thus the debtor submitted itself to, and this court by approval of said petition, acquired, "* * * exclusive jurisdiction of the debtor and its property wherever located for the purposes of this section, and shall have and may exercise all the powers, not inconsistent with this section, which a Federal court would have had it appointed a receiver in equity of the property of the debtor by reason of its inability to pay its debts as they mature."

Section 77B (c) provides that the court: "(8) if a plan of reorganization is not proposed or accepted within such reasonable period as the judge may fix, or, if proposed and accepted, is not confirmed, may, after hearing, whether the proceeding be voluntary or involuntary, either extend such period or dismiss the proceeding under this section or, except in the case of a railroad or other public utility or of a debtor which has not been found by the judge to be insolvent, direct the estate to be liquidated, or direct the trustee or trustees to liquidate the estate, appointing a trustee or trustees if none shall previously have been appointed, as the interests of the creditors and stockholders may equitably require." (11 U.S.C.A. § 207 (c) (8).

No one but the debtor questions its insolvency. In fact the plan proposed by Cities Service Company made no provision for stockholders upon the theory and supposition that the debtor was insolvent.

If, as now appears, that proposed plan was inadequate, but had been confirmed, the majority stockholders would have derived the benefit, if any, arising therefrom, to the detriment of the minority in the equity of the debtor's assets.

It is contended by the minority interests, that assuming that the service stations will be disposed of at the upset price offered, or better, the plan proposed by them will facilitate a feasible reorganization of the debtor and may result in the payment of 100 per cent. to creditors and perhaps provide something for the stockholders.

For the reasons heretofore stated, the court is not disposed at this time to dismiss the proceeding; the court cannot or-

der a liquidation in advance of a determination of insolvency and feels, moreover, that if there is a reasonable prospect of effecting such a reorganization the minority interests should not be foreclosed.

It is conceded that if the offer to purchase the service stations were included in and constituted a part of a plan of reorganization submitted in accordance with the provisions of the statute (section 77B (b), 11 U.S.C.A. § 207(b) that the court would have the power to order a sale, but the debtor asserts that in the absence of such a plan the court is without power to dismember and dispose of such a substantial fraction of its assets, without its consent, and the Cities Service interests which, through stock ownership, have heretofore controlled the personnel of the board of directors and the officers elected by them, now joins with the debtor in that opposition.

So far as I have been able to find, after exhaustive examination, there is no reported case in which the precise question presented has been determined.

Counsel for the parties in interest favoring the order applied for, cite cases in which it has been held that the court had and may exercise the power to effect a sale, but an examination of these cases discloses that, either (1) the sale was effected upon consent of the parties; or (2) that the question of authority was not raised; or (3) that the assets were perishable in character; or (4) negligible in amount. In re Finco Dye & Print Works, Inc. (D.C.) 16 F.Supp. 174; In re Allied Owners Corporation (C.C.A.) 79 F.(2d) 187; In re Adolf Gobel, Inc. (D.C.) 12 F.Supp. 225; Id. (C.C.A.) 80 F.(2d) 849; In re Rosenbaum Grain Corp. (C.C.A.) 83 F.(2d) 391; Glassman v. Philadelphia Rapid Transit Co. (C.C.A.) 82 F.(2d) 397. But the principles therein stated have by analogy been helpful in reaching the disposition arrived at.

The trustees have now had five months' experience in the operation of the business of the debtor, including the service stations owned by it and its subsidiaries. As a result they have presented facts to the creditors and to the court which demonstrates, to my mind, that the continued operation of the service stations has been for several years past, and will continue to be, a loss and drain upon the assets of the debtor. It appears to me that the only hope of effecting a feasible plan of reorganization at all is dependent upon the disposition of the service stations.

The offer of the Gulf Oil Company has been extended until today (December 16, 1936) and if the trustees are authorized to enter into the proposed definitive contract, that offer will thereby be extended until a sale has taken place and the parties have been heard upon the confirmation thereof.

There is another consideration which bears upon the disposition of this application.

The Swan-Finch and Standard Oil Company of New Jersey judgment, which, with interest and costs, now exceeds half a million dollars, was recovered more than three years ago. All efforts on the part of the debtor to review the validity of that judgment by appeal have terminated.

It is only by virtue of the terms of the order approving the voluntary petition herein that the judgment creditor has not heretofore been able to proceed to a sale of the property of the debtor in New Jersey upon which the judgment is a lien, at a time and under circumstances when it would doubtless have been at a great sacrifice to the interest of the debtor and its creditors.

Objections are made with respect to the mechanics in effecting a sale. Each of the subsidiaries has its own creditors. It is claimed by the debtor and the Cities Service interests, that so far as the subsidiaries organized under the laws of the state of New York are concerned, that such a sale would be a fraud upon the creditors unless conducted under the provisions of the Bulk Sales Law (chapter 45 of the Laws of 1909, as amended by Chapter 759 of the Laws of 1935 [Consol.Laws N.Y. c. 41, § 44]), and that an investigation should be made and prospective bidders warned with respect to similar or other statutes in New Jersey, as well as concerning the requirements of the state of Maine where the debtor was incorporated.

So far as the creditors of the respective subsidiary corporations are concerned, the sum realized upon a sale of the service stations should be paid over to the trustees and retained by them as a separate

earmarked fund, from which would be first discharged the liens which the service stations are subject to, conceded to aggregate slightly less than $2,000,000, not including the Swan-Finch judgment. It would then be necessary for the court, upon proper proof, to determine the allocation of the balance of the fund to the respective equities and direct payment in a pro rata distribution to the creditors of the respective subsidiaries.

On the other hand, if the offer of the Gulf Oil Company is suffered to expire by its limitation, it is obvious, from the record, that the trustees must continue the unprofitable operation of the service stations until they are otherwise disposed of, in which event it is unlikely that a sum so favorable as the upset price now before the court, could be obtained.

It seems to be the theory of counsel that if a sale is authorized, the court must be governed by the provisions of subdivision 3 of General Orders 18 (11 U.S.C.A. following section 53) but apparently the amendment thereto, effective June 1, 1936 (11 U.S.C.A. following section 53) has been overlooked. It reads: "4. This General Order shall not apply to reorganization proceedings under Section 77 or Section 77B of the Act."

It is also urged that notice must be given as required by section 58 of the Bankruptcy Act (11 U.S.C.A. § 94) and appraisers appointed and a sale conducted as required by section 70b (11 U.S.C.A. § 110(b) but from a careful reading of the act, it is manifest that these provisions have no application whatever unless and until there has been an order of liquidation, and subdivision (k) of section 77B, 11 U.S.C.A. § 207(k) becomes operative. But these are matters which affect the marketability of the title and must be passed upon if and when the sale is had and confirmed.

For the foregoing reasons, the application of the trustees will be granted as a step "in aid of the proposed plan of reorganization."

Order to be settled on Monday, December 21, 1936, at 10 o'clock a. m. at my chambers, and in the meantime the court will be glad to confer with counsel with respect to the provisions of the proposed order.