**In re CENTRAL OF GEORGIA RY. CO.**
No. 4829.

District Court, S. D. Georgia,
Savannah Division.

Dec. 23, 1942.

Order Affirmed May 5, 1943.

446

Anderson, Cann & Dunn, of Savannah, Ga., and Larkin, Rathbone & Perry, of New York City, for Central Hanover Bank & Trust Co.

Hitch, Morris & Harrison, of Savannah, Ga., and Debevoise, Stevenson, Plimpton & Page, of New York City, for Liberty Nat. Bank & Trust Co., of Savannah, Ga.

Adams, Douglas & Brennan, of Savannah, Ga., for Citizens & Southern Nat. Bank.

Root, Clark, Buckner & Ballantine, of New York City, for New York Life Ins. Co.

Alexander & Green and Edward W. Bourne, all of New York City, and Henry B. Brennan, of Savannah, Ga., for Bankers Trust Co. of New York.

Carter, Ledyard & Milburn, of New York City, and Oliver, Oliver & Davis, of Savannah, Ga., for First Mortgage Income Bonds.

W. W. Beachboard, of Newark, N. J., for Prudential Life Ins. Co.

Lee, Congdon & Fulcher, of Augusta, Ga., for Refunding General Mortgage.

Wallace Miller, General Counsel, of Macon, Ga., and Anton P. Wright, President, of Savannah, Ga., for the Southwestern R. R.

Charlton Ogburn, of New York City and Emmett McCaffery, of Washington, D. C., for Reconstruction Finance Corporation.

T. M. Cunningham and A. R. Lawton, Jr., both of Savannah, Ga., Edwin S. S. Sunderland and Chester F. Leonard, both of New York City, and George O'Donnell, of Savannah, Ga., for trustee and debtor.

LOVETT, Judge.

As a result of the hearing held in this case on December 1, 1942, at which many aspects of an early reorganization of this railroad were discussed by the parties at interest, two questions remain for determination at this time.

The first is whether and what interest shall be paid now on certain bonds of the debtor, including one underlying issue which the debtor has not assumed, from earnings of the railroad in reorganization, and, secondly, what direction, if any, shall be given by the court to the trustee of the debtor at this time with respect to the refinancing of the Collateral Trust Bonds of the Central Railroad & Banking Company now matured, also not assumed by the debtor. The equity of the collateral pledged to secure these Collateral Trust bonds is owned by the debtor. It is urged by the mortgage trustee of the Collateral Trust Bonds that the debtor's trustee should be instructed to pay the principal and interest owing on them, or the injunction heretofore issued against the exercise by the mortgage trustee and the bondholders of their rights and remedies should be dissolved.

These questions will be considered in the inverse order of their statement.

These matters came on for a hearing in this way. The Central Hanover Bank & Trust Company of New York as trustee under the Collateral Trust Mortgage of the Central Railroad & Banking Company of Georgia filed its petition in these proceedings on August 31, 1942, and thereby became a party. The prayer of the petition was, in effect, that the court instruct the debtor's trustee to make his recommendation for financing payment of the bonds. On this petition the court entered an order setting the matter for hearing on October 21, 1942 (later adjourned to December 1), and directing that all parties at interest be notified and be entitled to participate and be heard at such hearing. The trustee of the debtor was directed to present data sufficient to inform the court and the parties as to the most practicable method of dealing with said Collateral Trust Bonds consistent with the rights of the holders thereof and in the best interest of the debtor's estate and of its reorganization.

Subsequently the Liberty National Bank & Trust Company of Savannah, Georgia, as trustee of the First Mortgage of the debtor securing its "First Mortgage Bonds", and Central Hanover Bank & Trust Company of New York, as trustee of the First Mortgage of the Chattanooga, Rome & Southern Railroad Company, se-

curing the underlying bonds mentioned, have filed their petitions asking that all of the past due interest coupons on their bonds respectively be paid at this time. At the hearing the Bankers Trust Company of New York, as trustee of the Consolidated Mortgage securing the "Consolidated Bonds" of the debtor, appeared and asked that interest should be paid on the bonds secured by its mortgage.

The trustee of the debtor on the hearing submitted and filed an elaborate statement accompanied by exhibits setting forth the financial condition of the trust estate, plans for the rehabilitation of the properties of the debtor, and other relevant matters touching the reorganization of the railroad. He has made certain recommendations to the court, in the light of the cash resources of the estate and the other matters set forth in his statement, with respect to the amount of interest which he considers can be safely paid at this time, the total of which is $1,013,133.00. As the result of negotiations between him and the trustees of the bond mortgages last mentioned he has modified these figures upward until now he indicates that $1,150,633.00 in his opinion may be presently paid. These recommendations seem satisfactory to the trustees representing the First Mortgage and Consolidated Mortgage bonds, but are unsatisfactory to the trustee of the Chattanooga, Rome & Southern Mortgage bonds and to the trustee of the Collateral Trust Mortgage bonds. As trustee of the Collateral Trust Mortgage the Central Hanover takes the position that no interest should be paid on any bonds (except Chattanooga, Rome & Southern bonds) until provision has been made for the payment in full of the Collateral Trust bonds; and the same bank as trustee of the Chattanooga, Rome & Southern underlying mortgage insists that because of the high earnings of its mortgaged property all of the past due interest on the bonds secured by that mortgage should be paid in full before any interest is paid to any other bondholders.

The trustee of the debtor has also advised the court that it will facilitate the refinancing of the Collateral Trust bonds and the reorganization of the railroad if a committee representing the several bond-holding interests is set up to serve in an advisory capacity to him, and that among the matters which he and the committee should promptly consider would be plans for the adjustment through negotiation of the Collateral Trust bonds. He also suggested in his statement that an additional committee of three should be set up to advise with him concerning the leased lines of the debtor, but this suggestion has been withdrawn.

The trustee of the debtor testified as a witness on the hearing, other evidence was taken, and several of the parties have submitted briefs to the court, which have been duly considered.

As indicated on the hearing, I consider it advisable to have the advisory committee suggested by the debtor's trustee named as promptly as possible to the end that all of the many matters that must be considered in a plan of reorganization may be given early attention, and the views of the parties with respect to them obtained.

■■ The mortgage trustee of the Collateral Trust bonds invokes the rule of law announced in Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. R. Co., 294 U.S. 648, 675, 679, 55 S.Ct. 595, 79 L.Ed. 1110, that sale of collateral by a pledgee in a case of this kind should be enjoined only if such a sale would so hinder, obstruct and delay the preparation and the consummation of the plan of reorganization as probably to prevent it, and in such event only reasonable delay should be countenanced. Attention is also called to cases in which it is held that the burden of proof is upon the debtor, or those supporting the injunction, to show that its granting or continuance is necessary. See In re Murel Holding Corp., 2 Cir., 75 F.2d 941; Guaranty Trust Co. of New York v. Henwood, 8 Cir., 86 F.2d 347, 354, 108 A.L.R. 1020; In re Prudence Co., Inc., 2 Cir., 90 F.2d 587, 590; In re New York, N. H. & H. R. Co., 2 Cir., 102 F.2d 923; Foust v. Munson S.S. Lines, 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49.

The question I must now decide is whether or not maintaining the status quo for a reasonable length of time hereafter is necessary to the formulation and putting into effect of a satisfactory plan of reorganization of the railroad. Some speculation must be indulged in when this question is answered.

Among the collateral pledged to secure the Collateral Trust bonds is substantially all of the capital stock of the Ocean Steamship Company, which stock is owned by the debtor subject to the lien of the Collateral Trust mortgage. For a long period of time

the Ocean Steamship Company, whose fleet of boats heretofore have operated between the ports of Savannah, New York and Boston, has been regarded as a most valuable adjunct, if not an integral part of the railway. The railway runs generally east and west, the steamship company north and south. The steamship line has been described as an "extension by sea" of the railway into the eastern markets, enabling it to compete with other railroads serving such markets and the south. Though because of the pressing need all of the ships of the steamship company have been requisitioned and taken over by the United States, it is not unreasonable to believe that when the war is terminated the service will be restored. There seems to be no dispute among the parties as to the advisability of retaining control of the steamship line in a plan of reorganization if that is possible.

Because of the lack of shipping facilities, the yet unadjusted value with the government of the ships requisitioned, the artificial control in large part of the traffic moving up and down the Atlantic seaboard, etc., it would be a difficult if not an impossible thing to fix a fair and equitable value upon the stock of the steamship company at this time except for liquidation purposes, and so far as I know none of the parties at interest here favor an immediate liquidation.

The only deep water terminals at the port of Savannah available to the debtor are those owned by the Ocean Steamship Company, the greater portion of which is leased to the railway, and all of which it serves with its tracks. The steamship company itself has a bond issue of $1,000,000.00, secured by mortgage on certain of its terminals in Savannah, which matures on July 1, 1943, and unless the railway or some one in its behalf accepts the responsibility for the re-financing or payment, it will go to default and jeopardize valuable properties producing large income to the railway.

The trustee of the debtor asks for some delay, though not for any unreasonable length of time, during which he and the committee advising him may consider and negotiate with the Collateral Trust bondholders and their representatives, including the mortgage trustee, for the re-financing of these bonds. Since the hearing in this case it appearing the debtor would offer no plan, an order has been entered directing the trustee to formulate and present a plan of reorganization of the railway not later than June 19, 1943, unless the time is further extended. He has already done much preliminary work necessary in the formulating of such a plan. His efforts continue at the present time.

The present trustee of the debtor qualified early in January of the present year, and was unfamiliar with the properties and operations of the railway in detail prior to his appointment and qualification. Necessarily, much of his time and attention has been given to a study of the many problems of operation, traffic, equipment, etc., that have perplexed all railroads during the emergency of war. However, he has not been lacking in diligence in trying to find a market for the pledged collateral. Thus far he has not been successful. He now asks for more time and the counsel and advice of a committee. That is all he asks.

The Collateral Trust bonds matured in 1937, but under an extension agreement assented to by at least $4,747,000.00 out of $4,840,000.00 of bonds the maturity was extended to May 1, 1942. Interest has been paid currently, the last payment being made on or about November 1, 1942. It is now adjudged that future interest, because of the maturity of the bonds, will be at the rate of 6% per annum, whereas before the rate was 5%. From the figures before me, it seems reasonable to believe that the next interest payment on May 1, 1943 may be provided for in full. In no very real sense was there any default on the bonds prior to May 1 of this year.

While I can not say with absolute unqualified and mathematical assurance that a dissolution of the injunction forbidding the mortgage trustee and the bondholders of the Collateral Trust bonds from "interfering with * * * or enforcing liens upon * * * any portion of the properties * * * of the debtor" will destroy the possibility of presenting a satisfactory plan of reorganization of the railroad, I am nevertheless satisfied that to set the mortgage trustee at liberty to exercise a power of private sale at public outcry of the pledged collateral, with the requisite authority from the bondholders required by the trust indenture, will greatly hinder and delay both the preparation and consummation of such a plan and probably may prevent it. If the steamship company's stock is sold, and the trustee of the debtor is un-

able to acquire it, in my view a satisfactory plan of reorganization that will assure any substantial net income after fixed charges on a reasonable recapitalization will be well nigh impossible. I fail to see how without the maintenance of the status quo at least for six months any satisfactory plan can be worked out. All of the estimates of the debtor's trustee of future earnings, normal year, fixed charges, capital expenditures, etc., now before the court, and available to all of the parties, have been prepared upon the assumption that the steamship line would at the end of the present emergency again become available to it as an "arm by sea" into the north and east. Certain it is that if the pledged collateral is sold a considerable amount of preliminary work looking to the plan of reorganization already done will have to be done over again.

To permit the steamship line to be divorced from the railway at this time is tantamount to a dismemberment of the system. If I properly understand the philosophy of section 77 of the Bankruptcy Act as amended, 11 U.S.C.A. § 205, under which these proceedings were taken, among other things, it was to prevent the disintegration of a railway by parceling out the mortgaged property in divisions or according to prior liens, and to preserve it as a unit of the national transportation system until reasonable opportunity has been furnished to develop and submit a plan of reorganization which will be fair and equitable to all of the interests concerned. If at the very time the trustee, his advisory committee, and the several bondholders committees are attempting to develop such a plan they are met with the threat that the steamship company, regarded by many of them as an integral part of the system, is to be withdrawn and liquidated or operated independently of the railway, they will be denied what I consider a reasonable opportunity through negotiation to reorganize the system as a whole.

Nor can I see how the mortgage trustee or the Collateral Trust bondholders are greatly injured by allowing the trustee approximately six months to develop his plans. The bondholders are not denied their interest. In that respect they occupy a better position and enjoy a better return than the bondholders of the railway proper, for all of the bonds of the railway are in default with respect to interest and bear a lesser rate. Since the steamship company is not now operating the value of the stock, if a market can be found, should not greatly fluctuate. As indicated, it seems likely that funds will be available to meet the interest payment maturing May 1, 1943. To give the mortgage trustee of these bonds entire freedom of action at this time in disposing of the collateral, in my opinion, will be a serious obstacle to the development of any fair and equitable plan of reorganization of the railway as a whole, and will make it extremely difficult, if not impossible, for the architects of the plan to proceed promptly with its development. It was the considered opinion of the debtor's trustee, Mr. Callaway, that the dissolution of the injunction would make the development of the plan quite impossible at this time. I am unable to reach any different conclusion.

There is another and compelling reason why the mortgage trustee should have his contractual rights postponed for a season. Unless postponed, at the outset of reorganization litigation is thrust upon the court by the parties. That would be unfortunate in advance of the parties sitting down together in an effort to reconcile differences and agree upon a fair and equitable method of re-financing matured obligations or having them cared for in a plan of reorganization. Litigation inevitably would obstruct and delay reorganization. Certain of the railway lines on which there are mortgage lien and bonds outstanding have earned substantial amounts of money, and from their point of view at least those earnings are their property, though no formal order for a segregation of earnings of the mortgaged lines during the reorganization proceedings has yet been entered. They look upon those earnings as a part of their security. If an attempt is made now, before negotiation has exhausted the possibility of agreement, to divert those earnings, in whole or in any substantial part, to the payment of any obligation which the debtor has never technically assumed, they will and do object, and further litigation will follow. If, on the other hand, the mortgage trustee for the Collateral bonds is set free to exercise any or all of his contractual rights under the trust indenture securing the bonds, which includes power of private sale upon the written request of the holders of the majority in interest of the bonds outstanding, and by giving at least three months notice

of the time and place of sale, the court loses all control over the subject matter except as the trustee may be authorized by the court to bid at such sale. If a situation of this kind is created, it is also not unreasonable to suppose there will be further litigation at the threshhold of reorganization.

To refuse to dissolve the injunction at this time and to allow the trustee and the several committees to negotiate with the owners of the Collateral Trust bonds until next June does not mean that the collateral other than the Ocean Steamship Company stock must be frozen in the hands of the mortgage trustee for that length of time. If, as the result of negotiations, it is made to appear that a satisfactory price can be obtained for the other pledged collateral, the attention of the court may be called to that fact, and an appropriate order entered modifying the injunction and allowing the sale. As far as I am able to foresee there is no great risk of sudden market changes in the value of the other pledged collateral during the next six months.

It is urged by the mortgage trustee of the Collateral Trust bonds that no interest should be paid on any of the debtor's outstanding bonds until provision has been made for the re-financing of the bonds which it represents, and some emphasis is laid upon the fact that the First Mortgage of the debtor is a first lien upon the equity of the railway in the Ocean Steamship stock, the Consolidated Mortgage is a second lien, and the equity in the balance of the pledged collateral is subject to the lien of the Consolidated Mortgage. It is said that the injunction is not for the benefit of the Collateral Trust bonds or the general estate but inures only to the benefit of the holders of the First Mortgage and the Consolidated Mortgage and, perhaps, other bonds, which have, or may claim to have, junior liens upon the pledged collateral. · If they wish to preserve their liens against divestment by sale of the pledged collateral, it is said they should consent to the use of the earnings of their mortgaged lines to the extinguishment of these bonds. I am unable to accept this point of view. It seems to me it is the duty of the court to maintain the status quo for a reasonable length of time not for the purpose of preserving junior liens but to allow a reasonable opportunity through negotiation by the parties at interest to work out a satisfactory, fair and equitable plan for the re-financing of these bonds and for the reorganization of the railroad. That is the dominant thought which ought to be in the minds of all of the parties at interest, having due regard also at all times to their respective obligations as fiduciaries to those whom they represent.

My conclusions, therefore, on these issues are that though the petition of the Central Hanover Bank & Trust Company as trustee of the Collateral Trust bonds should not be dismissed, and relief under it should not be denied unconditionally, the injunction should be continued, and the debtor's trustee should not be instructed at this time to pay the principal and interest of the Collateral Trust bonds. If at the end of six months, or prior to June 19, 1943, it is made to appear to the court that negotiations have broken down, that no re-financing is possible and no agreement can be reached for taking care of these bonds in a plan of reorganization, on appropriate motion the petition can be again called up, and relief granted.

The second question relates to the interest which the mortgage trustees under the First Mortgage bonds, the Consolidated bonds and the Chattanooga, Rome & Southern Underlying bonds now seek to have paid.

The trustee of the debtor, in his answer, to the petition of the trustee of the Chattanooga, Rome & Southern Mortgage, and also in his answer to the petition of the trustee of the First Mortgage, made the point that the pledge of income by the Mortgagors was invalid, but this contention was reserved and not pressed because it did not seem necessary to decide this issue at this time.

Exhibit 6 submitted by the trustee of the debtor shows for the period August 1, 1933, to June 30, 1942, during which interest has been withheld in whole or in part, net earnings were as follows:

|  |  | times interest earned |
| --- | --- | --- |
| First Mortgage.... | $6,170,341 | 1.98 |
| Consolidated Mortgage .......... | 5,534,496 | .67 |
| Chattanooga Rome & Southern Mortgage .......... | 1,190,618 | 5.34 |

All of the other mortgage lines showed on said Exhibit a deficit for the period, except in the case of Refunding & General

Mortgage there was a comparatively small credit.

There had been paid on the First Mortgage during the equity receivership of the railroad, which preceded these proceedings in bankruptcy, three interest coupons aggregating $525,000.00, and on the Chattanooga, Rome & Southern bonds three coupons, aggregating $37,500.00.

The trustee of the debtor arrived at the amount proposed to be paid on these three issues of bonds by calculating 12½% of the earnings of each of these mortgage lines and charging each mortgage line with the coupons already paid. This percentage will not produce the exact amount which the trustee proposed to pay, so he adjusted the amount arrived at by this percentage so as to pay the amount hereinbefore stated.

The percentage of earnings of each of the three mortgages to the total of the earnings of the three mortgages is as follows:

|  | Earnings | per cent of total |
|---|---|---|
| First | $6,170,341 | 47.85 |
| Consolidated | 5,534,496 | 42.92 |
| C. R. & S. | 1,190,618 | 9.23 |

If the distribution between the three mortgages is made on the basis of two coupons to the First Mortgage, two coupons to the Consolidated Mortgage, and twelve coupons to the C.R. & S. Mortgage, the percentage will be as follows:

|  |  |  | per cent. of total payments | earnings per cent. |
|---|---|---|---|---|
| First paid heretofore | $525,000 |  |  |  |
| " pay now | 350,000 | $875,000 | 44.02 | 47.85 |
| Consolidated, cash on hand | $274,367 |  |  |  |
| " pay now | 650,633 | $925,000 | 46.52 | 42.92 |
| C. R. & S. paid heretofore | $ 37,500 |  |  |  |
| C. R. & S. pay now | 150,000 | $187,500 | 9.46 | 9.23 |

■ The chief object of these proceedings is to bring about a reorganization of the affairs of the debtor, and in the plan of reorganization effect will be given to the earnings of the several lines which compose the system. In a reorganization proceeding a mortgage creditor has no unqualified right to demand that the earnings from his security should be paid over to him pending reorganization. A high ratio of interest coverage may establish a right to preferred treatment under a reorganization plan, but it does not create a right to priority in distributions of earnings pending the reorganization. I think the court may, in the exercise of a proper discretion, having due regard to the exigencies and necessities of the trust estate, and the requirements of reorganization, provide for the ad interim payment of interest to mortgage creditors, provided interest has been earned by the security of the creditor and the security is sufficiently ample to justify such payments. Such payments may be justified on the theory that they will pro tanto reduce the amounts which will have to be taken care of in reorganization.

The trustee of the debtor estimated (Exhibit No. 1) his cash at January 1, 1943, $8,064,041.00 (not including $500,000.00 in a special deposit for reorganization expenses), but stated in his evidence that he was now advised that the cash would be about $9,000,000.00 by January 1, 1943.

He also laid before the court his program for the rehabilitation, improvement of, and additions and betterments to the road, property and equipment of the debtor, which he testified were expedient and necessary. This program called for an expenditure over a period of five years of $15,249,400.00, of which $4,914,800.00 was for rails, $1,457,600.00 for road property, and $8,877,000.00 for equipment. The expenditures called for by this program for the year 1943 were rail $982,960.00; road property $767,590.00, and equipment $1,775,400.00; total $3,525,950.00.

The trustee called attention to the fact that in view of the small mandatory charges on which a reorganization of the property could be predicated, it would be difficult to raise cash in reorganization by sale of securities, or assessments or otherwise, for working capital, additions and betterments and to protect the credit of the reorganized company, and therefore, in his opinion it was wise and necessary to put up a cash reserve so as to afford the reorganized company a cash surplus; and he suggested that at least $1,000,000.00 should be set aside in 1942-43, and $1,000,000.00

in 1944 for such purposes. The trustee further stated that he required a cash balance of at least $1,000,000.00 for ordinary operations. Attention was also called to the fact that $1,000,000.00 of Ocean Steamship Company bonds fell due July 1, 1943, and that the trustee would probably be called on to pay this mortgage debt, as the Steamship Company would probably not have at that time the necessary cash resources, all of its ships·having been taken over for purchase by the government, and there being no likelihood that they would be paid for by that time.

There is also the contingency that a considerable amount of cash may be required in connection with the liquidation of the Collateral Trust bonds.

No dissent to the program of rehabilitation of the property proposed by the trustee of the debtor was heard at the hearing on December 1st, and some of ₅the creditors affirmatively supported it.

■ Under all the conditions I agree with the trustee that he can not at this time safely pay out more than $1,150,633.00 interest on mortgage bonds, but this amount he can pay.

[9] Central Hanover Bank & Trust Company as trustee of the Collateral Trust mortgage of Central Railroad & Banking Company of Georgia does not hold such a position that it can legitimately object to the payment of interest on the bonds of the debtor. The debtor has never assumed the Collateral Trust mortgage debt, and the interest will be paid out of funds of the debtor on which the trustee of the Collateral Trust mortgage has no claim whatever.

■ The trustee of C.R. & S. mortgage contends that when the distribution is made on the basis of the percentage of the earnings of each mortgaged line, this leaves out of consideration that the C.R. & S. mortgage line has earned the interest on its bonds 5.34 times, whereas the First mortgage line has earned interest 1.98 times, and the Consolidated mortgage .67 times. According to the theory of the trustee of the C.R. & S. mortgage, the principal and interest on this mortgage should be paid before any interest is paid on the other two issues and all past due interest should be paid on the First mortgage bonds before any interest is paid on the Consolidated mortgage bonds. With this theory I can not agree. The most eq-

uitable way to distribute the money now available for interest among the three issues of bonds is to pay to each issue approximately the same percentage of earnings credited to each mortgaged line. The result is that the First mortgage bondholders will be paid two coupons, the Consolidated bondholders two coupons, and the C.R. & S. bondholders twelve coupons. The C.R. & S. bondholders will be paid six times as many coupons as will be paid to the other two issues. The C.R. & S. bondholders get recognition of the fact that their interest has been earned more times than the other two issues. There are 17 coupons now in default on the C.R. & S. bonds. If 12 coupons are now paid, there will remain only five coupons in default, and, if a subsequent distribution is made of interest on mortgage bonds, it is probable that all of the defaulted coupons on the C.R. & S. bonds will be paid. I have less hesitancy in making this distribution in this way because the trustee of the debtor testified that about two-thirds of the earnings of C.R. & S. mortgage line were derived from overhead traffic, that is, two-thirds of the earnings came from traffic contributed by the other lines of the Central or going overhead to other lines of the Central.

I make no effort at this time to appraise the relative security of these three issues of bonds or their relative standing in a reorganization plan. Whatever is paid now on these three issues will be paid without prejudice to the rights of the holders of them and without prejudice to the rights of the other parties to this proceeding and without prejudice as to future distribution, if any. It should be further understood that the court is not finally adjudicating the rights of the parties, and that this matter is subject to adjustment on final accounting, or in the plan of reorganization. In the order which will be passed in this matter the foregoing conditions will be incorporated.

My finding is that the trustee shall as soon as practicable pay (a) to the trustee of the First Mortgage the sum of $350,000.00 to be applied by it to payment in full of the two earliest coupons in default, (·b) to the trustee of the Consolidated Mortgage $650,633.00, which, together with $274,367.00 cash in the hands of this trustee, shall be applied by it to the payment in full of the two earliest coupons in default, (c) to the trustee of the C.R. & S.

Mortgage $150,000.00 to be applied by it to the payment in full of the twelve earliest coupons in default. This interest shall be payable by the respective trustees of the mortgages at the earliest date practicable to be fixed by the order and if practicable before January 1, 1943, and the trustee of the debtor shall advertise the necessary notices.

A committee of five will be set up, consisting of one representative each of the First Mortgage, Consolidated Mortgage, Refunding & General Mortgage, the Divisional Mortgages, and the Reconstruction Finance Corporation to act in an advisory capacity to the trustee of the debtor in the formulation of a plan of reorganization, which the trustee of the debtor has been ordered to file within six months from December 19, 1942. This will include the re-financing of the Collateral Trust bonds. The debtor has very few unsecured creditors, but if it should appear that their interests need representation on this committee, provision later can be made therefor. The trustee with the advice of this committee will as soon as practicable and promptly consider the re-financing of the Collateral Trust bonds.

Let the trustee of the debtor forthwith present an order in this matter in conformity with the foregoing opinion.